Nathan B. FISCHER, Plaintiff,

v.

INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION et al., Defendants.

No. 74 C 576.

United States District Court, E. D. New York.

March 7, 1978.

Avrom S. Fischer, Brooklyn, N. Y., for plaintiff.

Wormser, Kiely, Alessandroni, Mahoney & McCann, New York City, for ITT.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Rohatyn & Lazard.

Debevoise, Plimpton, Lyons & Gates, New York City, for Black & Friedman.

Davis, Polk & Wardwell, New York City, for defendants Geneen, Bennett, Brittenham and Dunleavy.

## MEMORANDUM AND ORDER

PLATT, District Judge.

In this class action[1] all parties have moved for judicial approval of a proposed settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and counsel for the class has moved for an award of counsel fees and reimbursement for his costs and expenses.

In support of the motion, class counsel has submitted an 85 page affidavit with three appendices containing pertinent exhibits and a somewhat more abbreviated (15 page) memorandum of law and defendants have submitted a 29 page memorandum of law. In addition, the parties submitted a copy of the report of the Referee with respect to the proposed settlement in an action in the New York County Supreme Court captioned *Shapiro, et al. v. Black, et al.* (Index No. 20191/1976). At the request of the Court, the parties have also submitted depositions taken of Messrs. Harold S. Geneen, President and Chairman of International Telephone & Telegraph Company ("ITT"), and Felix G. Rohatyn, Director of ITT and partner of Lazard Freres & Co. ("Lazard"), in an allegedly related class action suit entitled *Herbst, et al. v. International Telephone & Telegraph Corporation, et al.* 72 F.R.D. 85 (D.C.Conn.), and, before the Securities and Exchange Commission ("SEC"), in an investigation made by the SEC (*inter alia*) into the matters and transactions described in plaintiff's amended complaint herein, a copy of an order issued by the SEC on October 13, 1977, accepting certain offers of settlement of ITT and Lazard, copies of affidavits filed with the Internal Revenue Service by Messrs. Harold

S. Geneen, Felix G. Rohatyn, Thomas F. X. Mullarkey (partner of Lazard), Andre Meyer (partner of Lazard), Howard Aibel (General Counsel of ITT), Richard Bateson (attorney for ITT), DeForest Billyou (attorney for ITT), and Robert A. Kagan (Director of Tax Planning and Research for ITT), and a report by Lehman Brothers Kuhn Loeb, Inc. on the question of proof of damages herein.

By stipulation dated May 20, 1977, the parties have proposed to settle this action with a payment by the defendants, ITT and Lazard, in the sum of $300,000 with 6% interest from April 15, 1977, and by the assumption by the defendant, ITT, of the costs and expenses of giving notice to the class and of processing the settlement. The individual defendants are not contributing to the settlement. The $300,000, with interest, will be paid to the class members *pro rata* in proportion to their claims after the deduction of any expenses and fees which may be awarded to class counsel by the Court. The class is defined in the settlement agreement as those persons who purchased "$5 Cumulative Preferred Series 'O' stock ("Series O Stock") of ITT between April 13, 1971 and March 6, 1974 and who beneficially owned such shares on April 18, 1973 or on March 6, 1974 or on both of such dates."

In return for such consideration all of the defendants will be discharged from any and all claims which were or might have been alleged in this action arising out of or in any way relating to any of the facts or transactions alleged or referred to, directly or indirectly, in the pleadings herein by any class member.

Pursuant to an order of this Court, a notice of the pendency of this action as a class action and a notice as to the proposed settlement was mailed to the class members on June 7, 1977, which required any class member who wished to appear and object to the settlement to file a notice of intention to appear and to file papers in support of any objection by July 12, 1977, and which provided for a hearing on the proposed set-

---

1. For this Court's opinion and order certifying the class in this proceeding, *see Fischer v. International Tel. & Tel. Corp. et al.,* 72 F.R.D. 170 (E.D.N.Y.1976).

tlement in this Court on July 22, 1977, at 2:00 P.M. No objections to the proposed settlement have ever been filed and no one appeared at said hearing to oppose or object to the proposed settlement.

The facts are set forth in considerable detail in the above-cited affidavit of class counsel, and in somewhat more summary form in the joint memorandum submitted by the defendants, and will only be summarized herein.

ITT first offered and sold a million shares of its Series O Stock to the public on April 13, 1971, pursuant to a prospectus issued in connection with the public offering thereof.

Plaintiff, who asserts he examined such prospectus and relied upon it in purchasing five shares of Series O Stock on February 15, 1973, claimed that the prospectus and subsequent reports issued by ITT were false and misleading in that there was a failure to disclose an allegedly false and misleading application which had been submitted by ITT and the Hartford Fire Insurance Company ("Hartford") to the Internal Revenue Service ("IRS") for a ruling that the ITT acquisition of the common stock of Hartford was a tax-free reorganization under section 368 of the Internal Revenue Code.

On April 18, 1973, it was publicly disclosed for the first time that the IRS was considering revoking the ruling that it had previously issued in connection with such acquisition and on March 6, 1974, the IRS, in fact, revoked the tax ruling that it had issued in 1969 and took the position that the exchange by Hartford shareholders of their shares for ITT securities was a taxable event.

This revocation by the IRS was occasioned by a re-examination by the IRS of ITT's sale, before the acquisition, of its Hartford stock to Mediobanca S.p.A. ("Mediobanca").

By way of background to this transaction, it should be noted that on November 12, 1968, ITT purchased 1,282,948 shares of Hartford common stock from Insurance and Securities, Incorporated ("ISI") at a base price of $50 per share and commission fees of an additional $0.45 per share and thereafter ITT purchased in the open market an additional 458,400 shares of Hartford common stock all before March 13, 1969.

On April 9, 1969, ITT and Hartford signed a merger agreement under which a wholly-owned subsidiary of ITT would be merged into Hartford and each share of Hartford common stock would be converted into a share of ITT Cumulative Preferred Stock, $2.25 Convertible Series N ("Series N shares").

On April 15, 1969, an application was made to the IRS for a ruling that the proposed merger constituted a tax-free reorganization within the meaning of section 368(a)(1)(B) of the Internal Revenue Code and in the application it was represented, apparently on the advice of counsel, that prior to the meeting of Hartford stockholders to approve the proposed merger agreement, ITT would unconditionally dispose of its 1.7 million shares of common stock of Hartford and would not hold any such common stock immediately prior to the consummation of the merger.

Thereafter, because of various events, including an announcement by the Antitrust Division of the Justice Department that it would seek to enjoin the merger, and a suit by it to enjoin the same, the market value of the Hartford shares fell substantially to under $40 a share. Because of this depressed market, ITT faced a severe problem in trying to sell its stock without subjecting itself to a tremendous loss.

Under the belief that the Hartford stock would go up in value if and when the government antitrust action were successfully disposed of and the obstacles to the merger were removed, ITT sought an arrangement by which it might postpone determination of the price of its disposition of its Hartford shares until after the Hartford stockholders had approved the merger.

Mr. Geneen's testimony is that in August of 1969 he asked Mr. Rohatyn, an ITT director and a partner in Lazard, to assist in the location of a buyer who would be willing to acquire title to the stock then and to defer determination of the actual purchase

price until a date subsequent to the consummation of the proposed merger. Mr. Rohatyn testified that he spoke with Mr. Andre Meyer who was the senior partner of Lazard and Mr. Meyer immediately suggested Mediobanca, an Italian bank in which Lazard had a small interest and with which Lazard had an arrangement under which they shared equally any profits derived by Mediobanca from business generated in the United States. Mr. Rohatyn said that he disclosed this arrangement and relationship to Mr. Geneen but Mr. Geneen denied any recollection of ever receiving any such information.

From negotiations which ensued there emerged a proposed agreement pursuant to which Mediobanca would purchase ITT's Hartford shares at a price to be determined in one of three ways at Mediobanca's election, viz:

1.  $51 per share or the market price of the shares on the closing date, if higher, if Mediobanca did not elect to have the price determined under either the second or third pricing options (section 3 of the Contract of Sale);

2.  An amount equal to (i) the average fair market value of the Hartford shares (as determined by Lazard) for the two week period ending May 31, 1971, plus (ii) the amount of dividends paid on such shares from the closing date to June 10, 1971 (section 4 of the Contract of Sale); or

3.  An amount determined by reference to any sales proceeds received by Mediobanca if it should sell to other parties any of the Hartford shares sold to it by ITT in arms-length resales of such shares through Lazard prior to May 31, 1971 (section 5 of the Contract of Sale).

Under the proposed agreement ITT was also to pay Mediobanca, before execution of the contract, the sum of approximately $0.765 per share, or $1,332,131.22, as an inducement to Mediobanca to enter into the contract.

On October 14, 1969, ITT submitted the proposed contract of sale to the IRS with a request for a supplementary tax ruling that such sale met the IRS requirement for an unconditional disposition of the Hartford shares, and on October 21, 1969, the IRS responded as follows:

"It is held that the proposed sale by ITT of the shares of Hartford stock to Bank (Mediobanca), as described above, will constitute an unconditional disposition of stock for purposes of our ruling letter dated October 13, 1969."

The agreement was executed on November 3, 1969 and closed on November 9, 1969. On November 3, 1969 Mediobanca advised ITT through Lazard that it had elected to have the pricing provisions of sections 4 and 5 of the Contract of Sale applied to the Hartford shares delivered to Lazard for its account.

On November 10 the Hartford shareholders met and voted approval of the merger and on November 12, 1969 the ITT Board of Directors, having been advised by Mr. Geneen "that ITT had disposed of all of its Hartford stock on November 9, 1969," adopted a resolution ratifying the ITT—Mediobanca contract. At the meeting Mr. Geneen reported that "there was transferred by the Corporation to the account of Mediobanca on October 30, 1969, the sum of $1,332,131.22 (the inducement payment) and on November 9, 1969, 1,741,348 shares of Hartford stock were delivered to Mediobanca to carry out such sale."

On December 13, 1969, the Insurance Commissioner of the State of Connecticut, disapproved the merger, but suggested that the transaction could be accomplished by an exchange offer. Accordingly, on December 23, 1969, ITT requested permission of the Insurance Commissioner to make an exchange offer whereby each share of Hartford common stock could be exchanged for one Series N share and this request was approved by the Commissioner on May 23, 1970. On May 26, 1970, ITT mailed its exchange offer to all of the Hartford shareholders and on June 10, 1970, the directors of ITT ratified the terms and conditions of the offer. By June 17, 1970, 95% of Hartford common stock had been surrendered in exchange for Series N shares, including

1,741,348 Hartford shares which had been previously delivered to Lazard to hold for Mediobanca and all of such surrendered stock was replaced with a like number of N shares.

Between November 17, 1970 and May 28, 1971, Mediobanca resold all of the Series N shares which it had acquired pursuant to the exchange offer and remitted, pursuant to its agreement with ITT, the proceeds of such sale less the expenses incurred in connection with such sales to ITT, thereby enabling the latter to recover the entire cost of the Hartford shares and an additional profit of about 6.5 million dollars. On November 12, 1970,[2] 800,000 shares were sold by Mediobanca to the Dreyfus Fund, 100,000 shares to Les Fils Dreyfus and 400,-000 shares to International Investment Associates.[3] Even though it had been represented to the IRS that ITT would have no control over the disposition of any of the shares transferred to Mediobanca and that all of the shares sold under the third pricing option were to be made through Lazard acting as broker, none of these transactions were consummated through Lazard and Mediobanca did in fact seek ITT's approval as to the fairness of the price obtained

2. On November 12, 1970, Mediobanca advised ITT that it was electing the third pricing option.

3. These last two resale transactions present additional facts of interest to this litigation. They involved purchases apparently indirectly financed by or related to simultaneous ITT purchases of the assets of the ultimate purchasers of the Series N Stock. In one instance, the sellers to ITT of Fabbriche Riunite Way Assauto, S.p.A., an Italian auto parts manufacturer, bought, with the proceeds of the sale, from Mediobanca through International Investment Associates and two individual nominees, 400,-000 shares of Series N Stock. In another instance, Charles Engelhard sold to ITT his interests in Eurofund International, Inc. and simultaneously purchased from Les Fils Dreyfus ("LFD"), a private bank with offices in Basle, Switzerland, which had a close relationship with Lazard, 30,000 shares of Series N Stock which LFD had purchased from Mediobanca. LFD also purchased and resold an additional 70,000 shares of Series N Stock but has declined to identify the client or clients for whom it purchased these shares on the ground that to do so would violate Swiss secrecy laws. Both the above two transactions involved a per

therefor. Between May 4 and May 11, 1971, Mediobanca sold through Lazard on the New York Stock Exchange the balance of its unsold holdings in the ITT Series N stock.

As indicated in our prior opinion herein, *Fischer v. International Tel. & Tel. Corp. et al.*, 72 F.R.D. 170, 172 (E.D.N.Y.1976), the gravamen of plaintiff's complaint is not the disclosure or non-disclosure of the facts with respect to this sale of ITT's Hartford stock to Mediobanca before the acquisition, but rather it was the failure of ITT to disclose in its prospectus, the registration statement or in various documents filed with the SEC that it had filed a false and misleading application with the IRS to obtain a favorable tax ruling which, according to the plaintiff, constituted a fraud upon the plaintiff and other purchasers of the Series O Stock in violation of section 17 of the Securities Act of 1933 and sections 9 and 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated pursuant thereto.

The questions raised by these claims for this Court's consideration in an evaluation of the settlement of this case are summarized by the class attorney as follows:

share price substantially under the market value for Series N Stock at the time; the purchase price in both instances being $55 per share and the market price at the two closings being $73.50 and $78.50.

While counsel for ITT states that "there is no evidence that any director, officer or employee of ITT or Lazard participated in, or even knew of any connection" between the ITT purchases and the Mediobanca resales, and while all participants denied any such knowledge in proceedings before the SEC, the SEC, in its final order dealing with its investigation of the Mediobanca transactions, suggested otherwise, concluding that the facts indicated that "the Series N shares were used to acquire Way Assauto as an undisclosed stock-for-stock acquisition" and that "the 30,000 ITT Series N shares were used in connection with the Eurofund acquisition to confer a valuable benefit upon Engelhard, a controlling shareholder of Eurofund." The SEC concluded that these transactions indicated "the extent to which ITT continued to exercise control over the shares," a fact which should have been, but was not, disclosed to the IRS.

1. Were the representations as to the complete disposition of the 1.7 million Hartford shares made to the IRS in the supplemental application either false or not complied with.

2. If representations in the supplemental application were either false or not complied with, was disclosure of that information material to a purchaser of the Series O Stock of ITT.

3. If the information was material to an investor in the Series O Stock of ITT, was any investor in the Series O Stock damaged by reason of the nondisclosure of that information?

4. If it can be proven that the representations in the application were either false or not complied with and that the information was material to an investor in the Series O Stock of ITT and that the failure to disclose that information did result in damage to investors in the Series O Stock, can scienter be proven against the defendants?

*The Reasonableness of the Settlement*

■■ In order to approve the proposed settlement of class claims under Rule 23(e), this Court must determine that the settlement is fair and reasonable and in the best interests of all those who will affected by it. In making this determination, the strength of plaintiff's case on the merits should be weighed against the amount offered in settlement. *State of West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085–86 (2d Cir.), *cert. denied, Cotler Drugs v. Chas. Pfizer,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). *See also, Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.), *cert. denied, Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974). As the Second Circuit noted in *Newman, supra,* at 692, quoting the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), the District Court must

"reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and 'form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.' "

This Court now turns to an analysis of the above four questions in the light of this legal standard of review.

As to the first question, class counsel concedes that if Mediobanca had elected to have its liability under the contract determined under the first pricing option contained in section 3 of the contract or the second pricing option contained in section 4, there would have been no question but that there was a complete disposition by ITT of its stock to Mediobanca.

However, as class attorney also points out, the third pricing option contained in section 5 of the contract was actually elected by Mediobanca, and had that pricing provision been the only one in the contract, the sale to Mediobanca would probably not have constituted a complete disposition.

The question is not, however, whether the third pricing option did not constitute a complete disposition or whether the inclusion of such a provision in the contract tainted the entire contract, because the IRS did in fact exempt the ITT Mediobanca contract as a complete disposition of the Hartford shares even though it contained the third pricing option. The crucial question for this litigation is whether the parties to the contract knew the third pricing option to be in fact the only option, the other two options being merely window dressing, and that this fact was not disclosed to the IRS.[4] In any trial on the merits plaintiff

---

4. As suggested by the SEC, see note 2, *supra,* plaintiff might also attempt to prove that ITT in certain respects retained control of the resale of its Hartford shares and failed to disclose this to the IRS. While class counsel disclaims any

interest or faith in this argument, this Court notes anyway that, inasmuch as the two relevant resale transactions were formulated after the IRS ruling and Mediobanca sale, even if plaintiff could prove that ITT did exercise some

would be required to establish that there was either a commitment in advance from Mediobanca to ITT to exercise the third pricing option which was not disclosed to the IRS or, alternatively, that ITT knew that Mediobanca was going to exercise the third pricing option and that, had this information been disclosed to the IRS, it would not have issued the ruling that it did.

As class counsel points out, the evidence as to whether ITT knew in advance of the execution of the contract that Mediobanca would not elect the third pricing option is in conflict. For the most part, the direct evidence, i. e., the testimony of the participants in the transaction, is, in essence, that there was no advance commitment by Mediobanca to exercise the third pricing option and that it was not a foregone conclusion that this option was necessarily going to be exercised. There is some documentary and circumstantial evidence to the contrary and there is a cogent argument that "it was highly improbable that Mediobanca would elect the first pricing option" because it would have involved an investment of approximately $90 million dollars on the part of Mediobanca which was a sum in excess of its entire investment portfolio.

In the defendants' files, however, there is a memorandum dated October 28, 1969, written by Mr. Richard Bateson, an attorney on the ITT legal staff, urging the prompt approval of the agreement with Mediobanca and the delay in the actual exercise by ITT of its "put" in order to maximize the profit that might be realized as a result of the then rising price for the Hartford stock in the event that Mediobanca exercised the first pricing option. As class counsel points out, if in fàct there had been a commitment on the part of Mediobanca not to exercise the first pricing option, it is unlikely that Mr. Bateson would have made reference to that possibility in a memorandum written virtually contemporaneously to the signing of the actual contract.

After analyzing the various arguments on this question, class counsel says that

"the single strongest factor for the plaintiffs in seeking to establish that there had been misrepresentations to the IRS would be the concern expressed in the memorandum of ITT that if the IRS were to carefully analyze the third pricing option the IRS would deny the ruling that ITT was seeking because the third pricing option in reality constituted only an agency agreement . . . However, there is no evidence that the defendants were seeking to confuse the IRS by withholding information,"

and concludes that

"[w]hile there was an obvious lack of candor with the IRS, the principal problem is not that a fraud was practiced on the IRS, but rather that the IRS issued a ruling which it never should have because the sale to Mediobanca did not constitute a complete disposition of the 1.7 million Hartford shares."

Without deciding the ultimate question, this Court concurs in plaintiff's conclusion that the evidence or proof showing misrepresentations or concealments of information by ITT from the IRS leaves a lot to be desired.

On the question of materiality, plaintiff claims that the "price movement of the ITT Series O Stock establishes that knowledge of the false tax application was material information to an investor in Series O Stock" in that "[i]mmediately following the announcement (on April 18, 1973) that the IRS was considering revoking the tax ruling there was a sharp break in every single publicly traded security of ITT . . . [a]nd when the ruling was in fact revoked there was a sharp market reaction."

control over the Series N shares in these resales, this would not necessarily prove that ITT planned to exercise such control in advance of the Mediobanca sale and IRS application, and thus would not necessarily prove misrepresentations of the sale to the IRS. Indeed, Mediobanca might well have exercised one of the other two pricing options thereby theoretically defeating all ITT interest in the Hartford shares. It would therefore seem that plaintiff's main claim must be based on any agreement or understanding between ITT and Mediobanca to only exercise the third pricing option, and a failure to disclose same to the IRS.

Defendants, however, submitted a careful analysis by Joseph F. Schwartz, Managing Director of Lehman Brothers Kuhn Loeb, Inc., dated December 29, 1977, pointing out:

" . . . 1973 was a period of especially heavy news regarding ITT. From January 1, 1973 through June 30, 1973, 66 articles related to ITT appeared in either the *New York Times* or *Wall Street Journal*, of which only three related to the tax ruling. The largest number of articles related to allegations concerning the role of ITT in the election of Salvador Allende Gossens as President of Chile. During this period ITT was denied its $93 million claim for insurance reimbursement for the value of its expropriated assets in Chile (a denial which was subsequently reversed). There were also many articles about the settlement of the government antitrust suits against ITT brought to block ITT's purchases of Hartford, Canteen Corporation and Grinnell Corporation. The articles noted that the Watergate prosecutor had commenced an investigation in the matter (the investigation was subsequently concluded without any charges being filed against ITT). In our opinion, the existence of extensive publicity as to such other events was a significant cause of the price decline of the Series O Stock in 1973.

"Finally, even though, in mid-April 1973, the Series O Stock was in the midst of a prolonged period of decline it did recover in price by May 3, 1973 to within $1.25 of the price at which it closed on April 17. In our opinion this price rise, occurring as it did soon after the announcement concerning the tax ruling, reflects a less negative evaluation of the impact of the tax ruling announcement on the future of ITT than the initial price drop appears to signify."

Again, in short, plaintiff at a trial might have difficulty in proving the materiality to a purchaser of the Series O Stock of ITT of any misrepresentations or failure to furnish information to the IRS.[5]

The above analysis is even more troubling to plaintiff's case on the question of damages. As suggested above, the price drop in Series O Stock, such as it was, cannot definitely be attributed solely to the IRS announcements. Therefore, the whole amount of such drop may not necessarily be provable as damages arising from the securities violations alleged in the instant case. *See, Feit v. Leasco Data Processing Equipment Corporation*, 332 F.Supp. 544, 586 (E.D.N.Y.1971); *Browner v. Tilar Indus., Inc.*, 74 Civ. 782 (E.D.N.Y. March 6, 1975).

Moreover, while there was a sharp drop in the price of the Series O Stock following the announcement that the IRS was considering revoking the tax ruling, as class counsel points out in his affidavit, any such damages can be minimized because the price of the Series O Stock rebounded within a couple of weeks to within a point and a quarter of the level it had been at prior to the announcement, and again, although there was a small drop following the announcement of the actual revocation, within a matter of days the price had rebounded to within a quarter of a point of that it had been at prior to the announcement. These facts would indicate that the total damages for which the holders of the one million shares of Series O Stocks could claim against the defendants, assuming they could establish the rest of their allegations by a preponderance of the evidence, would be, at best, only somewhat in excess of a million dollars.

Finally, there is the question of *scienter* which is an essential element in any action brought for violation of Rule 10b–5 or section 17. Also, as class counsel points out, there is an equivalent requirement under section 9 in that the statements made must

---

**5.** Of course the absence of a definite cause/effect relationship does not necessarily disprove materiality. For instance, the announcements about the tax ruling might also have been made at a time when no other negative information with respect to ITT was current and they might then have had a very substantial impact on the stock's price. That they in fact arguably did not, however, is probative of the lack of materiality of the undisclosed information and increases plaintiff's burden in proving otherwise.

have been made for the purpose of inducing trading.

As class counsel correctly points out, while "[t]he internal memoranda of ITT [may] indicate an attempt by the draftsman of the agreement to confuse the IRS by the use of an obscurely drafted agreement, not through the concealment of facts . . . [t]he officers and directors of ITT had no reason to assume that the application was false merely because the IRS was confused by it, or because the IRS issued an incorrect ruling." Moreover, as class counsel concedes, "[i]n view of the complexity of the transaction it is highly unlikely that the plaintiff will be able to establish that the Board of Directors of ITT or any of the defendants understood the transaction, let alone that the application itself was false [and] . . . [i]f defendants were not aware of the significance of the information, plaintiff could not thus demonstrate an attempt to defraud." In the absence of proof of such knowledge [6] that the application to IRS was itself false or of an intent to defraud the IRS, it would appear to be impossible to prove the requisite scienter with regard to the allegedly deficient prospectus. The individual participants to the Mediobanca sale, as noted above, have denied in affidavits, depositions, and testimony in other proceedings knowledge of any facts which might indicate the IRS application was false or a misrepresentation of the Mediobanca sale.[7] Thus, class counsel would appear to be faced with substantial obstacles in proving the requisite scienter to establish liability.

In summary, class counsel predicts that "[w]ere this action to go to trial I think it improbable that plaintiff would be able to establish that the supplemental application filed with the IRS was false or that there was a failure to comply with the material representation to the IRS. I think plaintiff could establish that there was an intent to confuse the IRS through the submission of an extraordinarily complex document but not through the withholding of facts or intentional misstatement of facts reprehensible as this may be. In addition I also believe it unlikely that the plaintiff would be able to establish at the trial an intention to defraud the plaintiff or any members of the class" and finally that "[t]he probabilities of the plaintiffs recovering anything upon the trial of this action are poor [and that] . . . the proposed settlement is fair and most beneficial to the class because the settlement guarantees the class will recover a sum which represents a significant portion of the total potential value of their claim."

The Court, after a review of the various depositions, statements, exhibits, affidavits and memoranda submitted herein cannot help but agree with class counsel's conclusion and hence has little difficulty in finding that the proposed settlement is fair, reasonable and adequate and is in the best interests of all members of the class.

### Class Counsel's Application for Attorneys Fees and Expert Consulting Fee

From April 13, 1974 to date, almost four years, class counsel has been working at various times on this case. In his affidavit in support of his application for attorneys fees he avers that during this period "I spent over 900 hours in the conduct of this litigation"; 15 hours in drafting the complaint, 90 hours in reviewing published material pertaining to ITT, Lazard and Mediobanca, 50 hours in research and drafting papers in opposition to the defendants motion for summary judgment and in support of plaintiff's motions for leave to amend the complaint, over 220 hours in reviewing material produced pursuant to discovery requests and in preparing for depositions, approximately 30 hours in preparing notices

---

6. Or in the absence of proof of a "reckless disregard" of the facts. *See, Rolf v. Blyth Eastman Dillon & Co., Inc., et al.*, 570 F.2d 38 (2d Cir. 1978).

7. This Court notes however that these affidavits, depositions, and testimony are clearly not conclusive proof. As noted above, *see* note 2, *supra*, at least one tribunal, the SEC, has expressed doubts with respect to at least some of such evidence.

of production and motion papers submitted in support of a motion to compel the defendants to produce documents, over 200 hours in researching the substantive and procedural tax questions, over 220 hours in researching the class action issues and drafting the moving papers and reply papers in support of the class action motion, approximately 80 hours in drafting the proposed class action orders and the memorandum in support of plaintiff's class action order, 50 hours in drafting of partial settlement papers and in research with respect to the question of indemnification and partial settlements, over 20 hours in drafting and reviewing the final settlement papers and the notice to the street name owners, approximately some 70 hours in the preparation and drafting of his affidavit in support of the settlement and his supporting memorandum, an additional 150 hours in various conferences with the court and with counsel, both in person and by telephone, and a further 50 hours in consultation with his expert, Dr. Sidney Robbins. Class counsel also points out that he spent another 25 hours in preparation and submission of that portion of his affidavit for a fee, but, as he knows, this time is not compensable. *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1102 (2d Cir. 1977).

Class counsel further states that for the past 12 years he has "been involved in federal litigation with a heavy emphasis in the derivative and class action area of federal securities and stockholder litigation", and that "[i]t is common knowledge that attorneys having my experience and responsibility in litigation such as this when paid on a noncontingent basis charge between one hundred and one hundred and fifty dollars an hour." Furthermore, he states that "where I charge on an hourly basis, primarily, in connection with the filing of reports with the Securities and Exchange Commission such as 10K's and proxy material, my billing rate is one hundred dollars an hour."

More significantly class counsel emphasizes that:

"There would have been no recovery for any member of the class had I not prosecuted this action on behalf of the class. In fact, no other attorney has sought on behalf of any other member of the class to prosecute the claims that have been asserted by the plaintiff on behalf of the class. Nor for that matter has any attorney for any other purchaser on the New York Stock Exchange of any ITT securities sought to recover for the violations of the Securities Acts alleged in this action even though every single other purchaser of any ITT securities was equally harmed by the alleged failure to make the required disclosure and could have asserted the same violations as plaintiff alleges. If there was a violation with regard to the plaintiff there was a violation with regard to every other purchaser on the New York Stock Exchange of any ITT securities, both common and preferred. But no other Attorney has prosecuted any such claim even though there were literally thousands of such purchasers during the very time period when plaintiff and the other members of the class made their purchases of the Series O stock."

Under all of the circumstances, class counsel states that he believes that "a fee of $85,000 with interest from April 15, 1977 is a fair and reasonable fee for the services that I have rendered to the class."

In addition, class counsel states that he has incurred an obligation of $6,000 for consultations with an expert, Dr. Sidney Robbins, during the course of the prosecution of this litigation and requests that the class be charged with this expense, together with interest on such sum from April 15, 1977.

According to class counsel, Dr. Sidney Robbins is Chase Manhattan Professor of Financial Institutions at Columbia University Graduate School of Business where apparently he teaches courses in Security Analysis, Corporate Financial Management and Planning and the legal and economic aspects of securities markets. He has also, according to class counsel, conducted seminars at Columbia in the handling of portfolios and money management for major in-

vestment companies. In addition, he is a director of the Oppenheimer Fund, the Oppenheimer Aim fund, the Oppenheimer Time fund, the Oppenheimer Special Fund, the Oppenheimer Monetary Bridge Fund and the Oppenheimer Tax Free Fund and, as Chairman of the Study Committee for the various Oppenheimer Funds, he regularly reviews all negotiated transactions and also is the director most active in reviewing portfolio transactions by the various funds. Dr. Robbins formerly was the Chief Economist of the Special Study of Securities markets of the SEC and was in the past retained by the SEC to assist in the creation of an economics department within the SEC. In addition, Dr. Robbins has been retained by the United States government through its A.I.D. program as a consultant to the governments of Korea, Israel, Iran, and Turkey, and he has served for several years as a consultant to the Central Bank of Thailand. Further, according to the plaintiff, Dr. Robbins, under the auspices of the United Nations, has been retained as a consultant to the governments of Tanzania, and Kenya. He is also a consultant to the Temporary Commission on the Finances of the City of New York. Among the standard college text books which he has authored or co-authored are Investment Analysis in Securities Markets, The Securities Markets Issues and Operations, Money Metropolis, The Financial Manager, Managing Securities, Money in the Multi-National Enterprises, and A Study of Financial Planning, under the auspices of Harvard University.

In further support of his qualifications class counsel points out that Dr. Robbins is or has been a consultant for IBM, General Electric, American Telephone and Telegraph, Banker's Trust, Toledo Trust, Booz Hamilton, Lybrand, Ross Bros. & Montgomery, Chicago Pneumatic Tool, the American Stock Exchange, the New York Stock Exchange and the Chicago Board of Options.

Class counsel apparently believed that he needed an expert "to discuss the circumstances and ramifications of the purchases by ITT of the 1.7 million Hartford shares as well as the subsequent disposition of these shares to Mediobanca and thereafter by Mediobanca" and further felt that Dr. Robbins' "expert knowledge of multinational corporations both as an author, teacher, and consultant made his advice with regard to ITT's motivation for selling the 1.7 million Hartford block in Europe rather than in the United States, the selection of Mediobanca and the disposition of several of the large blocks of the Series N Stock by Mediobanca in Europe invaluable."

Again, according to class counsel, Dr. Robbins spent in excess of 50 hours in consultation and analysis in connection with the prosecution of this litigation and his standard consulting fee is $1,000 a day.

With respect to counsel fees in class actions, the Court of Appeals for this Circuit in its latest pronouncement on the subject, *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977), ["*Grinnell II*"], reiterated the standards a District Court should follow in judging such a fee application. *See also City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), ["*Grinnell I*"].

The Court in *Grinnell II* indicated that the District Court must

> ". . . begin its inquiry . . . by first calculating the basic value of [the class attorney's] services. This [is] to be derived by multiplying the numbers of hours expended by [the] attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area. Once this base or 'lodestar' rate [is] established, other less objective factors, such as the 'risk of litigation', the complexity of the issues, and the skill of the attorneys, could be introduced to determine a final fee amount. But . . . the district court [should] articulate with particularity those aspects of [class counsel's] efforts which might lead it to increase compensation above the base rate."

*Grinnell II, supra*, at 1098.

The Court then noted, quoting *Trustees v. Greenough*, 105 U.S. 527, 536, 26 L.Ed. 1157 (1881) that

" . . . fee awards . . . [are] proper only 'if made with moderation and a jealous regard to the rights of those who are interested in the fund.' "

*Grinnell II, supra*, at 1098.

The Court cautioned that

"[e]ven when making allowance for such subjective factors as the 'risk of litigation', the courts must be mindful that an attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone. . . . "

" . . . the touchstone for the fee [is] to be the actual effort made by the attorney to benefit the class. In making its decision, the district court [is] to act 'as a fiduciary who must serve as a guardian of the rights of absent class members.' *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)."

*Grinnell II, supra*, at 1099.

Finally it is also perhaps significant to note, particularly in this case, that the Court of Appeals admonished District Courts that in "determining fee awards [we] should not be unduly influenced by the monetary size of the class settlement or judgment." *Id.*

In the *Grinnell II* case, it is perhaps important to note that the Court of Appeals took exception *inter alia* to the District Court's award of a lodestar fee for 1,350 hours devoted to the "administration of the settlement" at a rate of almost $90 per hour pointing out that "while someone must spend long hours processing consumer claims, it is widely recognized that 'it is not work requiring any great amount of professional skill.' *City of Philadelphia v. Chas. Pfizer & Co.*, 345 F.Supp. 454, 484 (S.D.N.Y. 1972)." *Grinnell II, supra*, at 1100. By way of contrast, in the case at bar, class counsel has not claimed and has advised the Court that he does not intend to claim a fee for any such administrative work.

In *Grinnell II* it is also important to note that the Court of Appeals ultimately approved an attorneys fee to the applicant in that case at the rate of approximately $100 per hour even though the attorney-applicant did not carry the "laboring oar" in the litigation and enjoyed and benefited enormously from work done by other able counsel which, of course, is quite different from the situation in which class counsel found himself in the instant case.

On the other hand, in this case, we must note that the class attorney has conceded that he did not keep daily time records and that the time figures contained in his affidavit are evidenced only by "reconstructed" time records which, as the Court of Appeals noted in *Grinnell II, supra*, at 1102, were held to be insufficient in *In re Hudson & Manhattan Railroad Co.*, 339 F.2d 114 (2d Cir. 1964), and *In re Wal-Feld Co.*, 345 F.2d 676 (2d Cir. 1965). In *Grinnell II*, however, the Court of Appeals affirmed the District Court's holding that "the hours allocated for the period that were not covered by time records are fair and reasonable."

At the request of the Court, class counsel has submitted papers in support of his "reconstruction" of the time which he says he spent performing the services outlined above and the Court is satisfied that the "reconstructed" time figures are fair and reasonable in this case.

In the light of all the foregoing and mindful of the admonitions of the Court of Appeals in *Grinnell II*, we hold that a fair and reasonable fee for class counsel's services is $74,000.

■ The somewhat more troublesome question perhaps is the payment to Dr. Robbins from the settlement fund of a fee of $6,000 for his consultant services. In retrospect, in view of the fact that the case was settled, one might say that it was not necessary for class counsel to have conferred at such length with Dr. Robbins to have achieved the results which he obtained in this case. Such an argument, however, has in it some "Monday morning quarterbacking" and assumes that class counsel should have "foreseen" that the defendants would be willing to settle this case for more than "nuisance value". If the case had gone to trial and the class had prevailed to the

extent of the settlement amount or more, no one could reasonably have faulted class counsel for the retention of an expert such as Dr. Robbins to assist him in the preparation for and at the trial itself. The financial transactions and the tax free reorganization question underlying the alleged violations of federal securities law in this case were, to say the lease, involved and complex. In this Court's view it was both prudent and necessary for class counsel to retain the assistance of a qualified expert for consulting and other purposes in connection with his preparation for trial and with a view towards using such person as a possible witness at an ultimate trial.

For an expert with the qualifications of Dr. Robbins a consulting fee of $1,000 a day is not unreasonable. The only remaining question in this Court's mind is whether, in the absence of time records, it can fully credit the estimate of consultation and analysis time of "in excess of 50 hours" by Dr. Robbins. Again, in view of the complexity of the problems involved in this case and the professional standing of Dr. Robbins, the Court feels that such estimate is both fair and reasonable and hence accepts and fully credits the same.

Accordingly, the Court approves the stipulation of settlement as fair and reasonable, holds that class counsel is entitled to and should be awarded counsel fees in the sum of $74,000 (without interest, however, from April 15, 1977, to date) and that Dr. Sidney Robbins is awarded the sum of $6,000 (again without interest from April 15, 1977) out of the settlement fund as an expense of the prosecution of this litigation, and directs that a judgment awarding such fees and expenses be entered herein.

SO ORDERED.