**Arnold S. WELLMAN, Plaintiff,**

v.

**Fairleigh S. DICKINSON et al., Defendants.**

**Mordecai ROSENFELD, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**JAY–GRO FABRICS, INC. PENSION TRUST, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**BECTON, DICKINSON AND COMPANY et al., Plaintiffs,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**Morton PUPKO, Plaintiff,**

v.

**Fairleigh S. DICKINSON, Jr., et al., Defendants.**

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**Rubin POLNE, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

Nos. 78 Civ. 284 (RLC), 78 Civ. 291 (RLC), 78 Civ. 345 (RLC), 78 Civ. 539 (RLC), 78 Civ. 1025 (RLC), 78 Civ. 1055 (RLC) and 78 Civ. 1156 (RLC).

United States District Court, S. D. New York.

July 31, 1980.

Theodore Sonde, Charles L. Lerner, Robert B. Blackburn, Robert Romano, Washington, D. C., of counsel, for Securities Exchange Commission.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Becton, Dickinson

& Company; Arthur Liman, Robert Smith, Jack Hassid, Susan P. Carr, Colleen McMahon, Paul B. Kertman, New York City, of counsel.

Parker, Auspitz, Nesseman & Delehanty, New York City, for other plaintiffs; Jack C. Auspitz, Barrington Parker, New York City, of counsel.

Kreindler & Kreindler, New York City, for Jay-Gro Fabrics Inc. Pension Trust and lead counsel for class plaintiffs; Paul Bernstein, Edward Grossman, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, Wachtell, Lipton, Rosen & Katz, New York City, for Sun Co., Inc.; Peter M. Fishbein, Jay G. Strum, Vincent J. Syracuse, Harvey Belkin, Barry Willner, Jay Wishingrad, New York City, Douglas S. Liebhafsky, Peter C. Hein, New York City, of counsel.

Orans, Elsen, Polstein & Naftalis, New York City, for Fairleigh S. Dickinson and Ann Turner Dickinson; Sheldon H. Elsen, Leslie A. Lupert, Robert Polstein, Paul Summit, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Salomon Bros., F. Eberstadt & Co.; Edmund H. Kerr, Judith Ripps, Steven Hartz, New York City, of counsel.

Sullivan & Cromwell, New York City, for Chemical Fund, Inc., Survey Fund Inc.; Marvin Schwartz, Michael Barron, New York City, of counsel.

Norman Annenberg, New York, for Bernard and Toby Feinstein.

## OPINION

ROBERT L. CARTER, District Judge.

*Status of the Proceeding*

The final stage has now been reached, at least in this court, of the litigation spawned by the acquisition in January, 1978, by Sun Company, Inc. ("Sun") of approximately 34% of the stock of Becton, Dickinson & Co. ("BD"). The nature and history of this bifurcated action is detailed in the opinion, reported at 475 F.Supp. 783 (D.C.N.Y.1979), that concluded the liability phase of this proceeding. Since familiarity with that prior determination is assumed, this opinion will limit recapitulation of the facts to those necessary for an understanding of the issues to be decided at this time.

This is a consolidated proceeding involving a corporate law suit (78 Civ. 539), a Securities and Exchange Commission ("Commission") enforcement proceeding (78 Civ. 1055) and 5 class actions (78 Civ. 284, 78 Civ. 291, 78 Civ. 345, 78 Civ. 1025 and 78 Civ. 1156) against Sun and other defendants, alleging violations of various provisions of the Securities Exchange Act of 1934 and the Investment Company Act of 1940.[1] The defendants other than Sun are L.H.I.W., a Sun subsidiary, Salomon Brothers ("Salomon"), F. Eberstadt & Co. ("Eberstadt"), F. Eberstadt & Co. Managers and Distributors, Inc. ("M & D"), Robert Zeller, Fairleigh S. Dickinson, J. Fitzgerald Dunning, Kenneth Lipper, Ann Dickinson Turner, Chemical Fund, Inc. and Surveyor Fund, Inc.

After a 4 week trial, it was held that Sun had violated sections 10(b) and 14(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(d), and Rule 10b–13 (17 C.F.R. §§ 240.-13d–1, 240.13d–2) promulgated thereunder; that Zeller, Lipper, Salomon and Eberstadt had aided and abetted the 14(d) violation; that Dickinson, Eberstadt, M & D and others, aided and abetted by Zeller, Lipper and Salomon, had violated section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d); and that Eberstadt had violated sections 17(d) and 17(e) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a–17(d), 80a–17(e), and Rule 17d–1 (17 C.F.R. § 270.17d–1) promulgated thereunder.

At this point much of the controversy has been resolved. During the liability trial, J. Fitzgerald Dunning settled with the class and corporate plaintiffs and took no further part in the trial. The Commission has

---

1. There were also allegations of violations of the New Jersey Corporation Takeover Bid Disclosure Law, New Jersey Laws of 1977, Chapter 76, and Rule 390 of the New York Stock Exchange.

reached a satisfactory settlement of its enforcement action against Dunning, Salomon, Lipper, Dickinson and Eberstadt. On January 26, 1979, Dunning consented to the entry of an injunction against him in the Commission's enforcement action, terminating that case. On February 15, 1980, orders were entered (1) setting forth the terms of the stipulation of settlement between the Commission, Salomon and Lipper and dismissing the Commission's action against Salomon and Lipper with prejudice; (2) setting forth the terms of the stipulation of settlement between the Commission, Eberstadt and M & D, now F. Eberstadt & Co., Eberstadt Asset Management and Eberstadt Fund Management,[2] and dismissing the Commission's action against the latter two defendants with prejudice; and (3) reciting the court's liability finding and order as to Dickinson and otherwise terminating the Commission's enforcement action against that defendant with prejudice. The court made no finding on liability against either the Chemical Fund or Surveyor Fund; the Commission is not seeking further relief against these funds, and BD will not pursue its claims against these defendants or any other defendant.

The Commission has also reached agreement with Sun settling its enforcement claims against that defendant. Similarly, BD has reached a settlement with Sun, and the class plaintiffs have reached a proposed settlement of the class's 14(d) claims against Sun and all the other defendants. All of these proposals have in common a plan of divestiture by Sun of its BD stock and continuing jurisdiction by the court to enforce the terms agreed upon. Since the plan of divestiture is a part of the class settlement, the proposed resolution of the Commission's and BD's cases against Sun cannot go forward unless the class settlement is approved.

The Commission, however, does seek injunctive relief against Robert Zeller in its enforcement proceedings, and the class plaintiffs press their 13(d) claims for damages against Lipper, Zeller, Salomon, Dickinson, Eberstadt and M & D.

*The Proposed Class Settlement*

I

The class plaintiffs are stockholders who as of the close of business on January 16, 1978, owned common stock of BD which was not sold to Sun, and debenture holders who at the close of that business day owned 4⅛% convertible debentures due in 1988, excluding defendants. The class consists of some 13,000 BD shareholders holding 12,706,846 shares and 889 debenture holders who hold the equivalent of 225,840 shares.

The proposed settlement with Dunning provided for payment of $375,000 to the class and BD. The corporation has waived any rights it has to share in this settlement fund. The money has been invested in U.S. Treasury bills and as of June 8, 1980, had accrued to $435,000. There is no opposition to the proposed class settlement with Dunning.

The proposed agreement with Sun provides for the corporation to pay the class $2,600,000 with interest at 8% from December, 1979, and up to $50,000 of the out-of-pocket disbursements of class counsel. All the 14(d), 10(b) and Rule 10b–13 claims arising out of the transaction that were, could have been or should have been pleaded against Sun, Salomon, Lipper, Eberstadt, Zeller or Dickinson are to be dismissed with prejudice, and all members of the class who have not exercised their right to opt out are to be permanently barred from prosecuting any such claims against these parties.

As has been indicated, the key element of the class settlement, as well as resolution of the enforcement proceeding and BD's claim against Sun, is the plan for divestiture by Sun of its BD stock. The plan provides that within three years of approval of the settlement Sun is to make a public offering of debentures that may be exchanged for Sun's BD stock at a price to be fixed by Sun at the time of the offering but not to exceed $60 per share.

---

**2.** Eberstadt and M & D have been reorganized. M & D is now Eberstadt Fund Management Co., and Eberstadt has separated its fund management business, now Eberstadt Asset Management Co., from its investment banking and brokerage business, now F. Eberstadt & Co.

The terms of the debentures cannot be less than 10 years and are expected to range from 10–25 years; and Sun is obligated to take all necessary action to divest itself of all of its BD holdings within 25 years after it first issues and sells the exchangeable debentures.

The holders of the exchangeable debentures will have the right to vote the shares by direction to an escrow agent who will hold Sun's 6,485,493 shares of BD stock; pending the sale of the debentures, Sun's shares will be voted in accordance with the vote of the majority of BD shareholders. This limitation on Sun's right to vote its BD holdings will not apply to matters of liquidation or mergers which involve the issuance of additional BD shares.

The agreement provides that beginning in the eleventh year of the plan's operation, Sun may make mandatory sinking fund redemptions of its debentures. If the debentures are called for but not exchanged for BD shares, BD has the right to buy the underlying shares at a minimum price of $49.50 per share. The price to be paid is to be based on a formula that depends on the initial price of the debentures and the market price and book value of the BD shares. BD's obligation to buy is limited to a maximum of 432,367 shares in any one year, except that if BD in any year purchases less than that maximum where such shares are available, Sun may require BD in the following year to purchase the amount of BD stock equal to that which it failed to purchase in the prior year. BD, however, may not be required to expend more than an aggregate of $200 million over the entire term of the agreement in purchasing such shares. Under certain conditions BD may pay a premium price of 15% over market or book value for the shares, but BD cannot be required to pay more than a total of $40 million in premium payments over the entire term of the agreement. Sun may sell those shares not exchanged for debentures or bought by BD at a public offering or may issue new exchangeable debentures. After issuance of its debentures, and until its BD holdings fall below 7.5%, Sun will be entitled to designate one nominee for election to the Board of BD on management's slate.

Notices of the proposed settlement were duly sent to the class. While neither the stipulation of settlement nor the terms of the plan of divesiture were themselves sent to the class, the notice stated to the class that Sun had agreed to divest itself of all its BD holdings under the agreement with BD, summarized the other terms of the class settlement and advised that the stipulation and plan of divestiture were on file with the court. In addition, the proposed plan was sent to all BD shareholders by BD management. Some 30 shareholders and 5 debenture holders have exercised their right to opt out pursuant to Rule 23(c)(2)(A), F.R. Civ.P., and the court is advised that 19 of these opting-out shareholders are believed to be members of the Dickinson family (Class Pl. Revised Mem. in Support of Settlement, pp. 14–15).

Bernard and Toby Feinstein, who own 10 BD shares and who did not exercise their right to opt out, filed objections to the proposed settlement on June 23.[3] In addition, they have filed a request for production of documents and answers to various interrogatories. The settlement hearing was held on July 8, 1980. The Feinsteins, represented by counsel, appeared at that hearing to press their objections and to

---

**3.** The Feinsteins instituted an action (*Feinstein v. New York Stock Exchange*, 78 Civ. 2368) in the course of the liability phase of this proceeding and sought permission to be joined as parties here. Permission was denied because it felt that their joinder would cause delay. That case is now pending before Judge Lowe. Magistrate Raby has recommended that its antitrust features be dismissed, and if the class settlement is approved, the federal securities law claims may be barred since the Feinsteins chose not to exercise their option to opt out of the proposed class settlement in this proceeding. As indicated in the text at page 833, what effect, if any, approval of the class settlement will have on the pending Feinstein case is a matter for determination by Judge Lowe, and the possibility that Judge Lowe may decide that a class settlement here bars the action pending before her is irrelevant to evaluation of the bona fides of the proposed agreement.

request a continuance. The court was advised of the objectors' need for the answers to their interrogatories and production of the requested documents to fortify their opposition to the proposed settlement, and that upon receipt of the requested answers and documents, pre-hearing examination of at least the expert witnesses of Sun and BD supporting the settlement might be necessary.

The Feinsteins were given the opportunity at the July 8 hearing to make their case for a continuance, to argue the merits of the settlement, to examine any of the parties' experts who were present on the viability of the plan of divestiture and to present any other relevant evidentiary proof in opposition to the settlement. The opportunity to provide evidentiary proof on the merits of their objections either by examining the parties' experts or by putting on their own witnesses was declined. Argument for a continuance and on the merits was heard. The request for a continuance was denied, and counsel was given until July 22 to file a memorandum supporting the Feinsteins' position. The court requested the Commission to file a memorandum setting forth its views of the plan of divestiture. Both memoranda were duly filed.

## II

Voluntary out of court settlement of disputes is "highly favored in the law," *D. H. Overmyer Co. v. Loflin*, 440 F.2d 1213, 1215 (5th Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *Newman v. Stein*, 464 F.2d 689 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972), and approval of class action settlements will be generally left to the sound discretion of the trial judge. *Reynolds v. National Football League*, 584 F.2d 280, 282–83 (8th Cir. 1978); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971). The considerations that are to inform the court's discretion have been fully articulated in prior adjudications, and are set forth for this circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Among the factors to be evaluated are the

reasonableness, fairness, wisdom and adequacy of the settlement, *ibid*; *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y. 1970) (Wyatt, J.), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed. 115 (1971), particularly as to the rights and interests of absent class members. *Feder v. Harrington*, 58 F.R.D. 171, 174 (S.D.N.Y.1972) (MacMahon, J.). However, court "approval cannot be a rubber stamp adoption of what the parties alone agree is fair and equitable." *Seigal v. Merrick*, 590 F.2d 35, 37–38 (2d Cir. 1978). Fairness, reasonableness and adequacy are determined by measuring the strength of the class case against what is being offered to terminate the litigation. *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1132 n.44 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979); *Lewis v. Anderson*, 81 F.R.D. 436, 438 (S.D.N.Y.1978) (Ward, J.).

There is a presumption in favor of the settlement when there has been arms length bargaining among the parties, sufficient discovery has taken place to enable class counsel to evaluate accurately the strengths and weaknesses of the plaintiff's case, only a few members of the class object and their relative interest is small. *Munsey Trust v. Sycor, Inc.*, 457 F.Supp. 924, 926 (S.D.N.Y.1978) (MacMahon, J.); *Feder v. Harrington, supra*, 58 F.R.D. at 174–75; *see also George v. Parry*, 77 F.R.D. 421, 424 (S.D.N.Y.) (MacMahon, J.), *aff'd*, 578 F.2d 1367 (2d Cir.), *cert. denied*, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Approval of the settlement by experienced counsel, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Munsey Trust v. Sycor, Inc., supra*, 457 F.Supp. at 926, and the participation in the negotiations resulting in the proposals by a government agency committed to the protection of the public interest and its endorsement of the agreement are additional factors which weigh heavily on the side of approval of the settlement. *Marshall v. Holiday Magic, Inc., supra*, 550 F.2d at 1178.

Yet, the factors that ultimately control the court's decision are its considered and objective appraisal of the probability that plaintiff will succeed if the case goes forward, *Slade v. Shearson, Hammil & Co., Inc.*, 79 F.R.D. 309, 313–14 (S.D.N.Y.1978) (Carter, J.); *Fischer v. International Telephone & Telegraph Corp.*, 78 F.R.D. 237, 242 (E.D.N.Y.1978), and the effect on the class if rejection of the settlement is followed by a verdict for defendant if the case goes to conclusion. *In re Scientific Control Corp. (Mascolo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.)*, 80 F.R.D. 237, 242 (S.D.N.Y. 1978) (Brieant, J.). Finally, while the court should not pass judgment on undecided issues, it should nonetheless take cognizance of the complexity, difficulty and uncertainty as to the ultimate resolution of these questions in determining whether a proposed class settlement should be finalized. *See Beecher v. Able*, 72 F.R.D. 518, 520 (S.D.N.Y.1976) (Motley, J.), *modified*, 441 F.Supp. 426 (S.D.N.Y.1977), *aff'd*, 575 F.2d 1010 (2d Cir. 1978).

The key element in the pending settlement—the plan of divestiture—has been the subject of hard negotiations among experienced and able counsel. In these negotiations the interests of the class plaintiffs, Sun, BD and the public were each separately and independently represented. The safeguards that Judge Friendly feared might not be present in the big case—where the size of the settlement fund and control over negotiations exercised by the parties guilty of violating the law might render the proposal less than representative, *Allegheny Corp. v. Kirby*, 333 F.2d 327, 347 (2d Cir.) (Friendly, J., concurring), *aff'd by an equally divided court*, 340 F.2d 311 (2d Cir. 1964) (en banc), *cert. dismissed*, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966)—were all in place in the dealings among the parties in this case.

At the settlement hearing on July 8, counsel for the Commission advised the court that the agreement had been submitted to the Commission on four separate occasions, that the Commission had studied it both in principle and definitively, and that the agreement had been reviewed by senior members of the staff of the Commission's enforcement division, members of the staff of the Division of Corporate Finance and other attorneys and professionals at the Commission familiar with investment banking issues and expert on Williams Act questions. All were satisfied that the plan of divestiture is in the public interest.

The plan of divestiture was approved by BD's board of directors. Kenneth D. Brody and John Whitehead of Goldman, Sachs & Co. participated in the negotiations on the plan of divestiture, and as specialists in investment banking advised BD on its implications and impact. Goldman, Sachs & Co. and Blyth, Eastman, Paine and Webber Inc. considered the financial obligations BD was to assume under the plan of divestiture and advised BD's board that it was "within the range of reasonable business judgment for BD to undertake the financial commitments represented by the terms of the settlement" (Brody affidavit, p. 4). As Brody points out in his affidavit, in evaluating the financial terms of the plan, the present value of the dollar figure cited in the plan must be discounted since these figures related to future, rather than immediate, mandatory sinking fund redemptions, purchases and sales.

Michael A. M. Keehner, Vice President, Corporate Finance, Kidder, Peabody & Co., Inc., who acted as investment banking adviser to Sun during the settlement negotiations, contends that if the entire issue of Sun debentures were exchanged in the 11th year for BD shares at $60 per share, based on Sun's 1978 purchase price of $45 per share, Sun would realize a return on growth of the investment of under 2¼ per cent per annum, which, even taking into account the current annual dividend yield on BD shares, would be far below available risk free investments, such as U.S. government securities, and far below the yield Sun will be required to offer on the debentures. Keehner further suggests that what Sun ultimately receives for its BD shares will be governed by market price or book value, both of which are currently below $45 per share. Hence, he concludes that Sun risks

taking a loss on its investment rather than being assured a profit as the Feinsteins urge (Keehner affidavit, pp. 2–3).

The Commission in its memorandum filed at the court's request states that its primary obligation was not to punish Sun but to achieve the purposes of the Williams Act. In its judgment that purpose is best achieved by the settlement agreement because Sun is required to divest itself of ownership of and voting rights in BD stock and is prevented from reaping any benefits from its acquisition. The Commission also favors the agreement because it feels that the negotiated proposal provides greater assurance of Sun's compliance than one imposed by the court; the undertakings Sun assumes minimize the likelihood that it will violate the Act in the future; the overall settlement will act as a deterrent to violation of the Act by others; and court supervision is provided. For all these reasons the Commission believes the public interest is fully served, and it endorses the settlement and urges court approval.

The Feinsteins have filed a memorandum setting forth in more detail the same objections to the settlement that they raised at the hearing. They contend that the settlement benefits Sun at the expense of BD stockholders, since it is argued that BD may be obligated to buy 432,367 BD shares annually, which figure multiplied by 15 totals 6,485,505 shares, the total acquired by Sun; that the plan is inconsistent with the public interest; that Sun is being allowed to pay $2,600,000 to the class for the right to dispose of its unlawful BD acquisition through a financing vehicle designed to benefit Sun at the expense of BD, BD stockholders and particularly the class. The settlement should be disapproved, it is contended, because it is an improper attempt to release the defendants from class action liabilities in *Feinstein v. The New York Stock Exchange*, 78 Civ. 2368, a case now pending before Judge Lowe. The Feinsteins also claim that the settlement fund is woefully inadequate; that the notice to the class makes untrue statements and omits material facts in failing to describe the basic ingredients of the plan and not advising stockholders of the extent of BD obligations; and that notice of the plan was not sent to all BD stockholders.

■ One of the basic weaknesses of these objections, as indicated at the hearing, is that they concentrate on the benefits to Sun without measuring any corresponding detriment to the class. Even if Sun benefitted this would not require disapproval of the settlement unless the agreement treats the class unfairly. Vindication of the public interest in enforcement of the Williams Act requires divestiture by Sun of its BD stock acquisitions. The Feinsteins complain that the long term period of divestiture will prevent other corporations from attempting to take over BD, thus depriving the class of the opportunity to share in premiums which accompany a tender offer in a takeover attempt. This result—the opportunity for the class to share in premiums—could be achieved by allowing Sun to undertake a 100% takeover of BD by offering to buy all remaining BD held shares at $45 per share, the price paid for its unlawful acquisitions. This obviously would not be in the public interest since Sun would be rewarded for its ingenuity in undermining the barriers erected by the Williams Act. Similarly, it is not in the public interest to allow Sun to dispose of its holding immediately to a single investor or group of investors. This course would enable Sun to profit from its wrongdoing. Nor is it in the public interest or in the interest of the class to require Sun to make a public offering of all of its 6,485,-505 BD shares. This course might depress BD stock with no compensatory benefit to the public.

The plan has uncertain features which will become clear only through market forces operative at the time the Sun debentures mature. While the court cannot forecast what those forces might bring about, when the Commission and its specialists endorse the agreement as being in the public interest, investment banking specialists for Sun and BD approve the agreement and the financial commitments entailed as being within the range of a reasonable business

judgment, the officers, board and counsel for BD approve the plan as in BD's best interest, and class counsel advises that the agreement is in the best interest of the class, the court would be hard pressed to disapprove the plan based on the speculative argument and inaccurate statements of objectors with such a minimal interest at stake. The Commission instituted its proceedings to protect the public interest in enforcement of the Williams Act. Class counsel instituted suit to protect the rights of the class. BD instituted action to protect the corporate interests involved. All these interests support the agreement. It is hard to believe that the Feinsteins with only 10 shares at stake can be a source for a sounder analysis of the impact of the agreement on the class, BD stockholders and the public than class counsel, the Commission and counsel for BD.

■ The effect of the settlement on the pending Feinstein litigation is not a basis for precluding approval of an agreement which the court concludes is fair and reasonable. That issue is a matter to be resolved by Judge Lowe in the litigation pending before her. *See Shlensky v. Dorsey*, 574 F.2d 131, 144 (3d Cir. 1978).

■ Notice to the class must, of course, contain a fair presentation of the proposed terms of the settlement. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175–76, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974). The class notice here met that requirement since the plan of divestiture was attached to the notice. In addition, the Sun stipulation and plan were mailed to all BD stockholders by BD's management. The formula for arriving at the pro rata shares of the shareholder and the debenture holder members of the class is clearly set forth in the notice. Therefore, there is no basis for a contention that the notice was in any way misleading.

The $2,600,000 fund seems reasonable in light of the hazards of continuing the litigation. Class plaintiffs' standing to seek damages may be questionable since they were not parties faced with a decision to accept or reject a tender offer. While in *Wellman v. Dickinson, supra*, 475 F.Supp. at 816–17, I did not accept defendant's narrow reading of the Court's language in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), a literal reading of the language used, "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer," *ibid*, could certainly be exactly what was intended. Moreover, if the litigation goes forward, there is no certainty that the court's decision as to the 14(d) violation would be approved on appeal. Indeed, even if its affirmance were a certainty, there is no assurance that this court or the appellate court would be convinced that the class suffered any injury entitling it to money damages for the 14(d) violation, or that the injuries to the class could not be adequately remedied by requiring Sun to divest itself of all of its BD stock. With these risks involving Sun, the prospects of the class's securing money damages from the other defendants as aiders and abettors in re the 14(d) violations are even more attenuated. With all the uncertainties, involved, class counsel was prudent indeed to settle the class claims and enter the instant agreement.

■ In sum, the objectors have not overcome the presumption favoring approval of the settlement agreement. One final point should be made. As previously indicated, the Feinsteins did not choose to opt out of the class settlement. If they were as certain of the substantiality of their objections as they profess, it is difficult for me to understand why they elected to be bound by a settlement which could deal a crippling blow to the viability of their pending litigation. At any rate, the objections are rejected, and the request to be allowed to engage in further pretrial discovery is, of course, denied. The agreement is approved. Class counsel's application for approval of disbursements of $39,724.04 for payment by Sun has been validated, and payment is approved.

### The Class Plaintiffs' Claim for Damages for the 13(d) Violation[4]

As indicated, there are 12,706,846 BD shares held by shareholder members of the class and the equivalent of 225,840 shares held by debenture holder members of the class, for a total of 12,932,686 BD shares held by class plaintiffs. Dickinson sold 802,138 shares, Chemical Fund and Surveyor Fund sold 443,200 shares, and Eberstadt discretionary accounts sold 52,175 shares to Sun, for a total of 1,297,513 shares, all at $45 per share. The closing price on the New York Stock Exchange for BD shares on January 16, 1978, was $32⅞ per share. Thus Sun paid a premium of $12⅛ per share over market price. Based on the premium of $12⅛ per share for the Sun acquisition, class plaintiffs calculate that Dickinson, Chemical Fund, Surveyor Fund and Eberstadt discretionary accounts received a total premium of $15,732,345 which they contend should be disgorged and distributed either solely among the class plaintiffs (12,932,686 shares) on a pro rata basis of $1.216 per share, or among the class, Dickinson, Chemical Fund, Surveyor Fund and Eberstadt discretionary account BD shareholders (14,230,199 shares) on a pro rata basis of $1.105 per share (Class Pl. Revised Mem., Ex. C).

The damage asserted by class plaintiffs is their being deprived of the opportunity to share in the premium which Dickinson, Chemical Fund, Surveyor Fund and Eberstadt discretionary accounts obtained. While the deprivation of the right to share in the premium relates to the 14(d) violation, class plaintiffs argue that the 13(d) violation "led directly or proximately to Sun's purchase" (Class Pl. Revised Mem., p. 9).

Defendants make several arguments. They point out that neither Salomon, Lipper, Zeller or Eberstadt own any BD shares, so that class plaintiffs' formula cannot ap-ply to them; that under section 28 of the Exchange Act recovery is limited to actual damages and none has been shown; that no class damages directly attributable to the failure to file a 13(d) statement have been established; that no private action for damages can be asserted under 13(d), and that the only action for damages for a 13(d) violation that can be asserted is one that is actionable under section 18; that class plaintiffs cannot qualify under that provision since no member of the class was a seller or purchaser; that to allow damages would be to give the class a windfall; and finally that whatever damages the class suffered, if any, are related to the 14(d) violation which has been settled.

Plaintiffs' argument is structurally flawed insofar as they seek damages based on the over-the-market premium received by defendants from the Sun purchases. The only defendant held to have committed a 13(d) violation who owned or sold any shares to Sun at a premium is Dickinson. Salomon, Lipper, Eberstadt, M & D and Zeller held no BD shares. While Eberstadt, M & D and Zeller had sufficient control of the BD shares held by the Chemical and Surveyor Funds and Eberstadt's discretionary account clients to commit these shares to Sun, Eberstadt's and M & D's beneficial interest in these shares did not encompass ownership of these holdings. Thus, the beneficiaries of the premium paid are Dickinson, the shareholders of the funds and the owners of the Eberstadt discretionary accounts, but the Eberstadt discretionary account clients are not named as defendants in any of the cases filed and the two funds were not held to have committed any Exchange or Investment Company Act violations. Eberstadt, M & D and Zeller did not receive any portion of the premium set out in the class plaintiffs' formula. Since these shareholders are not at fault and took

---

4. None of the class complaints alleged a 13(d) claim. It is true that one complaint (*Polne v. Dickinson*, 78 Civ. 1156) entitled its first count "Violations of §§ 13(d) and 14 of the Securities Exchange Act of 1934" but neither in that count nor elsewhere in the complaint are any specifications of a 13(d) violation set forth. Reference is entirely to infractions of section 14. This omission is not fatal, of course, since the pleadings may be amended to conform to the evidence. Rule 15(b), F.R.Civ.P.; *O'Brien v. Moriarty*, 489 F.2d 941, 943 (1st Cir. 1974); see *Wasik v. Borg*, 423 F.2d 44, 46 (2d Cir. 1970).

no action which injured the class, it is difficult to see on what theory disgorgement can be required of them. Dickinson committed no breach of any fiduciary obligations to the class in accepting the premium for his stock and in failing to give notice to other shareholders that he was receiving a premium for the sale of his stock to Sun. *Wellman v. Dickinson, supra,* 475 F.Supp. at 834–35. Accordingly, he has not been unjustly enriched so as to require the basic remediation of disgorgement. *See SEC v. Commonwealth Chemical Securities, Inc.,* 410 F.Supp. 1002, 1021 (S.D.N.Y.1976) (MacMahon, J.), *modified on other grounds,* 574 F.2d 90 (2d Cir. 1978). At best, perhaps, plaintiffs are requesting damages from Eberstadt, M & D, Zeller, Salomon and Lipper equivalent to the profits earned by their clients. The plaintiffs, of course, have indicated little interest in specifying what portion of the damages to the class is attributable to each defendant as long as the total $15.7 million in profits is shared in by the class. Unfortunately for the class plaintiffs, a court is required to devise a more exact determination for an award for damages, and under plaintiffs' formula, it is difficult to see how Eberstadt, M & D, Zeller, Lipper or Salomon can be held to pay any damages to the class on the basis of any illegal premiums. The Commission does not view it to be in the public interest to pursue its enforcement action against the funds or Dickinson and is not proposing any action against Eberstadt discretionary accounts. The implication of that determination seems to be that the Commission has concluded at a minimum that retention of the premiums received from Sun by Dickinson, the funds and Eberstadt discretionary accounts is not adverse to the public good.

While there is some question as to whether damages under the federal securities laws are limited to actual damages sustained, *see Abrahamson v. Fleschner,* 568 F.2d 862, 878–79 (2d Cir. 1977), *cert. denied,*

436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978), this court has held consistently that no implied private cause of action for damages exists under 13(d), and that only where a complainant meets the seller or purchaser requirement of Section 18, 15 U.S.C. § 78r, does a cognizable claim for damages for a 13(d) violation lie. The leading case on that issue is *Myers v. American Leisure Time Enterprise, Inc.,* 402 F.Supp. 213, 214–15 (S.D.N.Y.1975) (Weinfeld, J.), *aff'd without opinion,* 538 F.2d 312 (2d Cir. 1976). *Accord, Stromfeld v. Great Atlantic & Pacific Tea Co., Inc.,* 484 F.Supp. 1264, 1268–69 (S.D.N.Y.1980) (Werker, J.); *Treadway Companies, Inc. v. Care Corporation,* 490 F.Supp. 660, [Transfer Binder 1979–80] CCH Fed.Sec.L.Rep. ¶ 97,255 at 96,780 (S.D.N.Y.1980) (Goettel, J.); *Weisman v. Danielle,* [Transfer Binder 1977–78] CCH Fed. Sec.L.Rep. ¶ 96,278 (S.D.N.Y.1978) (MacMahon, J.).[5] Since no member of the class has charged that he sold his stock at an unfairly depressed price or bought it at an unfairly inflated price by virtue of the 13(d) violation, the class has no basis for suit under Section 18 under the authority of the above cases. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), is not to the contrary.

The most fatal weakness in class plaintiffs' claim in my opinion, however, is the failure of the class to demonstrate direct causation flowing from the 13(d) violation to the alleged injury suffered. Injunctive relief has been granted for 13(d) violations to block further purchases of stock, *e. g., GAF Corp. v. Milstein,* 453 F.2d 709, 720–21 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); to prevent execution of a planned proxy fight, *e. g., Bath Industries, Inc. v. Blot,* 427 F.2d 97, 111 (7th Cir. 1970); and to block a tender offer. *E. g., Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.,* 476 F.2d 687, 695–99 (2d Cir. 1973) (violation of section 14(e), 15 U.S.C.

---

**5.** Since no express private right of action is provided under section 13(a), the same result has been reached as to violations of that provision. *See e. g., In re Penn Central Securities Litigation,* 494 F.2d 528, 539–41 (3d Cir. 1974); *Rosengarten v. International Telephone & Telegraph Corp.,* 466 F.Supp. 817, 827 (S.D.N.Y. 1979) (Lasker, J.); *DeWitt v. American Stock Transfer Co.,* 433 F.Supp. 994, 1005 (S.D.N.Y. 1977) (Goettel, J.).

§ 78n(e)). However, injunctive relief cannot be secured without establishment of the basic requirement that irreparable harm has resulted from the 13(d) violation. *Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 57–58, 95 S.Ct. at 2075; *Universal Containers Corp. v. Horowitz,* [Transfer Binder 1977–78] CCH Fed.Sec.L.Rep. ¶ 96,-161 (S.D.N.Y.1977) (Conner, J.). This is so because unless there is a nexus between the claimed injury and the violation, no actionable wrong has occurred.

■ Connecting the injury to the violation is equally necessary for an award of damages. *See, e. g., Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 325 n.2, 99 S.Ct. 645, 648 n.2, 58 L.Ed.2d 552 (1979); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386–89, 90 S.Ct. 616, 622–24, 24 L.Ed.2d 593 (1970); *Pierre J. Le Landais & Co. v. MDS-Atron, Inc.,* 543 F.2d 421, 424–25 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977). Thus, in order to obtain damages in this case the class must prove that the damages which result from the injury alleged are directly connected or attributable to the violation claimed. The causation prerequisite to recovery of damages for a securities law violation is either a showing of an injury directly linked to a transaction authorized by virtue of the violation or an injury or loss directly attributable to the violation itself. *See, e. g., Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 719 (2d Cir. 1980) (Meskill, J., dissenting); *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–81 (2d Cir. 1974); *Limmer v. General Telephone & Electronics Corp.,* [Transfer Binder 1977–78] CCH Fed.Sec.L. Rep. ¶ 96,111 at 92,002 (S.D.N.Y.1977) (Conner, J.); *Tannenbaum v. Zeller,* [Transfer Binder 1979–80] CCH Fed.Sec.L.Rep. ¶ 97,-187 (S.D.N.Y.1978) (Carter, J.). There has never been a departure from this "rudimentary principle that causation will not be found to exist where there is lacking a single, logical procession from violation to the injury." *Marbury Management, Inc. v. Kohn, supra,* [Transfer Binder 1979–80] CCH Fed.Sec.L.Rep. at 97,408 (Meskill, J., dissenting).

■ No such progression has been established here. It is true, of course, that Dickinson, Eberstadt and the other defendants profited from the transaction, but all profited because Sun bought the stock, not because Dickinson, Eberstadt and M & D, with the aid of Zeller, Salomon and Lipper, failed to file a 13(d) statement. That failure did not cause Sun to purchase the stock in question. Zeller, Salomon and Lipper certainly helped persuade Sun to undertake the transaction, because Sun was able to secure a large block of BD stock quickly and quietly by dealing with a limited number of individuals and institutions. Moreover, it was not the failure to file the 13(d) that was the proximate cause of the class plaintiffs not being afforded the opportunity to share in the premium Sun offered; Sun's failure to comply with 14(d) was the only conceivable activity involved that could be said to have denied the class that opportunity. In the final analysis this really is the only injury the class suffered. Since settlement of that injury has been approved, I have no need to place a dollar figure on that injury and the class has no basis for seeking further damages for the 14(d) violation. Accordingly, the class claim for 13(d) damages against Zeller, Lipper, Salomon, Eberstadt and M & D has not been established and is dismissed.

*The Commission Enforcement Action*

The Commission proceeds in its enforcement action only against Zeller. Zeller and Lipper were the prime activists in seeking to find a party interested in taking a substantial position in BD stock through buying Dickinson's shares, those of his friends and those held by the Chemical Fund and Surveyor Fund.

The basis for issuance of injunctive relief in a Commission enforcement action is a proper showing that the party to be enjoined "is engaged in or about to engage in any acts or practices constituting a violation" of the federal securities laws. Section 21(d), Securities Exchange Act of 1934, 15 U.S.C. § 78u(d); *Aaron v. Securities & Exchange Commission,* —— U.S. ——, ——,

100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980). The court must find a " 'likelihood' or 'propensity' to engage in future violations." *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir. 1978). There must be convincing proof from which the court can make an inference that there is a reasonable likelihood of future infractions. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).

When Zeller was engaged in the activity which was found to violate the securities laws, he was a resident of New York City, Chairman of the Eberstadt Executive Committee, Vice Chairman of M & D, Chairman of Chemical Fund and Vice Chairman of Surveyor Fund. He received $50,000 in salary plus commissions and had the largest holdings in Eberstadt.

At present he has moved to Vermont, although he retains a small apartment in New York. Eberstadt has been reorganized. The Eberstadt investment management functions have been separated from its investment banking and brokerage operations. To accomplish the reorganization Eberstadt and M & D created a subsidiary into which all the assets of the two corporations were transferred except $1,000,000. The old Eberstadt now contained only the Eberstadt investment management functions. Marsh & McLennon bought this reorganized Eberstadt and M & D, created a subsidiary of its own which it merged into the old Eberstadt and M & D and issued Marsh & McLennon stock to old Eberstadt and M & D stockholders. Two new corporations were created. The old Eberstadt became Eberstadt Asset Management. M & D became Eberstadt Fund Management. The Eberstadt subsidiary became the new F. Eberstadt & Co. All the investment management personnel went to Eberstadt Asset Management and Eberstadt Fund Management, and all investment banking and brokerage personnel went to the new F. Eberstadt & Co. Old Eberstadt and M & D personnel still retain interlocking financial interests, however. The officers of the three Eberstadt organizations own Marsh & McLennon stock representing their financial holdings in Eberstadt Asset Management and Eberstadt Fund Management and have varying financial interests in the new F. Eberstadt & Co. Zeller, except for a financial interest, has no relationship with Eberstadt Asset Management or Eberstadt Fund Management. The new F. Eberstadt & Co. receives $400,000 a year in research fees from Eberstadt Asset Management and Eberstadt Fund Management.

As of September 27, 1979, Zeller, who had stopped functioning as Chairman of the Executive Committee in May, 1979, submitted his resignation from that position and is no longer an officer of Chemical Fund, Surveyor Fund or any Eberstadt organization.

Zeller does own 16% of the new F. Eberstadt & Co. Thus he continues to have the largest interest in that organization and is still registered as a general securities principal with the National Association of Securities Dealers. He still receives $50,000 a year in salary from F. Eberstadt & Co. which is the same salary he received when the violations at issue here took place. It should be pointed out, however, that as active chief executive of F. Eberstadt & Co., his salary was $250,000 a year.

Zeller considers himself now in retirement. This was his first violation of the law after a long and honorable career as a lawyer, investment banker and broker. Past violations without more are not sufficient to warrant the issuance of a permanent injunction in an enforcement proceeding. *See SEC v. Management Dynamics, Inc., supra*, 515 F.2d at 807. There must be some evidence from which the court could conclude that there exists a reasonable likelihood of future violations. *See SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Caterinicchia*, 613 F.2d 102 (5th Cir. 1980).

Zeller's conduct, spurred by his desire to secure a $350,000 fee from Sun, was particularly egregious in re the violations of sections 13(d) and 14(d) of the Exchange Act, and sections 17(d) and 17(e) of the Investment Company Act and not a mere techni-

cal infraction. *See SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1101. I also agree with the Commission that the defense of good faith reliance on the advice of counsel is not available to Zeller since he was not altogether candid with and may have misled counsel. *See United States v. Hill*, 298 F.Supp. 1221, 1235 (D.Conn.1969). Moreover, counsel was in no position to give disinterested advice in any event. *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181–2 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). Zeller surely acted with scienter, *see Aaron v. SEC, supra*, —— U.S. at ——, ——, 100 S.Ct. at 1949, and he has not cleansed the past violation by acknowledging that he was guilty of wrongdoing. Indeed, he asserts that he would act no differently in the future. Zeller holds a substantial, indeed the largest financial interest in the new Eberstadt which is involved in investment banking and brokerage business, and because of this interest as well as his prestige, experience and former authority as chief executive, his influence with present Eberstadt officers and personnel will be considerable. All these factors support the Commission's request for injunctive relief. *See SEC v. Commonwealth Chemical Securities, Inc., supra*, 574 F.2d at 100; *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

■ The question is a close one. Nonetheless, I am simply not persuaded that the requested injunctive relief is needed to vindicate the public interest. Settlement to the Commission's satisfaction has been reached with all Eberstadt and M & D entities as now reorganized. Zeller holds a substantial interest in the new Eberstadt, the only entity through which he could reasonably be expected to act in undertaking any future securities transactions that might transgress the law. While, as has already been stated, Zeller's influence over current Eberstadt officers and personnel may be very great, it seems to me that if the Commission's concern is that Zeller may be able to manipulate the use of the Eberstadt organization to violate the law, the proper course would have been for the Commission to seek a permanent injunction against Eberstadt itself. It chose not to do so. Instead, the Commission seeks an injunction against Zeller to bar him from engaging in future violations of the federal securities laws. There may be technical reasons why the Commission did not seek injunctive relief against the Eberstadt entity in which Zeller has a 16% interest. That organization was not in existence when Zeller's instant violations occurred. However, it was spun off from the two Eberstadt organizations that were held guilty of security law infringement, and all the assets of the two organizations before me, except $1,000,000, were transferred to the new Eberstadt. I see no reason why it could not be reached by injunction if necessary in the public interest. *See ICC v. Rio Grande Growers Cooperative*, 564 F.2d 848, 849 (9th Cir. 1977).[6] It may well be that the Commission decided there was no need for a permanent injunction against Eberstadt since its settlement with that organization bound the latter to follow a course of conduct in compliance with the law. Yet, if the settlement removed the necessity for injunctive relief against Eberstadt, it renders injunctive relief against Zeller inappropriate as well since it is unlikely that Zeller will engage in any future securities transactions except through Eberstadt. I believe the public interest to be fully protected by the stipulation of settlement with Eberstadt and that that interest will not furthered by

6. In *ICC v. Rio Grande Growers Cooperative, supra*, an injunction issued against the defendant, "its agents, employees, . . . and its successors" was held binding as to a corporation, not named as a defendant, established by defendant's principal to carry on defendant's activities. *See also Golden State Bottling Company, Inc. v. NLRB*, 414 U.S. 168, 175–77, 94 S.Ct. 414, 420–21, 38 L.Ed.2d 388 (1973); *Regal Knitwear Company v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945) (cease and desist orders issued under National Labor Relations Act § 10(c), 29 U.S.C. § 160(c), are binding as to "those to whom the [employer's] business may have been transferred, whether as a means of evading the judgment or for other reasons," regardless of whether they are named in the order).

the issuance of a permanent injunction against Zeller who is no longer actively engaged in the investment banking or brokerage business.

While "upon a proper showing" that a person "is engaged in or is about to engage in any acts or practices constituting a violation" of the Exchange Act or the regulations promulgated thereunder, the district court shall grant injunctive relief, *Aaron v. SEC, supra,* —— U.S. at ——, 100 S.Ct. at 1951, the elements of a proper showing include at a minimum proof that a person is engaged in or about to be engaged in substantive violations of the Act. *Ibid.* The likelihood that Zeller in his current retired status will violate the law in the future seems too remote and speculative to constitute the requisite demonstration of a reasonable likelihood of future illegality. *See SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 100. The burden of persuasion is on the Commission to prove that Zeller presents a realistic threat or is reasonably likely to violate the Act in the future, *see SEC v. Caterinicchia, supra,* [Transfer Binder 1979–80] CCH Fed.Sec.L. Rep. at 97,087, and that burden has not been met. I do not regard *SEC v. Bonastia,* 614 F.2d 908 (3d Cir. 1980), as requiring a contrary result.

*Conclusion*

The class settlement is approved. Class counsel's litigation disbursements in the amount of $22,884.78 and settlement disbursements in the amount of $16,884.16, for a total of $39,729.04, have been validated. Sun is ordered to reimburse class counsel for these disbursements, as required by the terms of the agreement. The class claims for damages against Dickinson, Eberstadt, M & D, Zeller, Lipper and Salomon for 13(d) violations are dismissed. The Commission's request for issuance of a permanent injunction against Zeller is denied. The claims against the Chemical Fund and Surveyor Fund are dismissed. Costs are to be awarded to the prevailing parties.

It is the court's understanding that with the instant determination all remaining outstanding claims will be settled or terminated. Under such circumstances it would probably be appropriate to set forth the resolution of all remaining outstanding claims in one adjudication.

SETTLE ORDER.