Arnold S. WELLMAN, et al.,
Plaintiffs-Appellees,

v.

Fairleigh S. DICKINSON, Jr.,
Defendant-Appellant.

Nos. 39, 40, Dockets 80–6213, 80–6357.

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 1981.
Decided June 24, 1982.

S. Lee Terry, Jr., Washington, D. C. (Jacob H. Stillman, Associate Gen. Counsel, Elisse B. Walter, Asst. Gen. Counsel, Ruth S. Epstein, Paul Gonson, Sol., Washington, D. C., of counsel), for appellee S. E. C.

Paul M. Bernstein and Kreindler & Kreindler, New York City, Lead Counsel for Stockholder Class and Liaison Counsel (Kaufman, Taylor & Kimmel, New York City, Co-Lead Counsel for Stockholder Class, Harvey Greenfield, New York City, Co-Counsel for Class Plaintiff Wellman, Pomerantz, Levy, Haudek & Block, New York City, Lead Counsel for debenture holder Class, Philips & Mushkin, P. C., New York City, Counsel for class plaintiff Polne, Rabin & Silverman, New York City, Counsel for class plaintiff Pupko, of counsel on the brief), for class plaintiffs and cross-appellants.

Sheldon Elsen, New York City (Orans, Elsen, Polstein & Naftalis, Leslie A. Luppert, Paul E. Summit, New York City, of counsel), for defendant-appellant.

Before LUMBARD, MOORE and VAN GRAAFEILAND, Circuit Judges.

LEONARD P. MOORE, Circuit Judge:

This appeal arises from seven separate actions brought against defendant-appellant, Fairleigh S. Dickinson, Jr., and eleven other defendants, for alleged violations of the federal securities laws, New Jersey state law, and the rules of the New York Stock Exchange. These seven actions include an enforcement action brought by the Securities and Exchange Commission ("SEC"), a private action filed by Becton, Dickinson & Company ("Becton") and certain of its officers, and five class actions brought on behalf of certain Becton shareholders. All seven actions stem from the acquisition by Sun Company, Inc. of approximately 34% of the outstanding stock of Becton, a New Jersey corporation engaged in the manufacture of health care products and medical testing and research equipment. The actions were consolidated for a bench trial before the Honorable Robert L. Carter, District Judge of the Southern District of New York. By agreement of the parties, the consolidated trial was bifurcated on the issues of liability and damages.

On the issue of liability, Judge Carter held, *inter alia*, that Dickinson, in an effort to induce a third-party takeover or partial takeover of Becton, had violated Section

13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d) (1976),[1] when he joined a group to sell more than 5% of the company's common stock without making the requisite filings with the SEC, Becton, and the exchange on which the securities were traded.[2] *Wellman v. Dickinson*, 475 F.Supp. 783, 837 (S.D.N.Y.1979). Before the trial on damages commenced, the SEC withdrew its request for relief from Dickinson other than a judicial declaration that Dickinson had violated Section 13(d). Accordingly, by order entered on February 19, 1980, Judge Carter adhered to the court's findings concerning Dickinson's liability and, with the SEC's consent, terminated with prejudice its enforcement action against Dickinson.[3]

On July 31, 1980, Judge Carter issued a final opinion addressing, *inter alia*, the class plaintiffs' claims for damages or disgorgement of profits against Dickinson and other members of the group found to have violated Section 13(d). *Wellman v. Dickinson*, 497 F.Supp. 824, 834–36 (S.D.N.Y.1980). Judge Carter held that these plaintiffs had no right to monetary relief against Dickinson for a number of reasons, including their failure to demonstrate that the Section 13(d) violations directly caused any injury to the class. Thus, the district court entered a final judgment on September 29, 1980, denying the class plaintiffs' claims for disgorgement and other monetary relief against Dickinson for his violation of Section 13(d).

Dickinson appeals from this final judgment and all prior orders in this case finding that he violated Section 13(d) of the Securities Exchange Act of 1934. Dickinson contends that plaintiffs have failed to prove either that the purported members of the Section 13(d) group had beneficial ownership of sufficient Becton stock to form a group with him, or that he had entered an agreement with anyone to dispose of Becton stock either directly or indirectly through agents. The class plaintiffs cross-appeal from those portions of the September 29, 1980 judgment denying their claims for disgorgement and other monetary relief against Dickinson and from the dismissal of their claims for breach of fiduciary duty against Dickinson. On appeal, the class plaintiffs renew their argument that Dickinson breached his fiduciary duty to the shareholders of Becton, and that he must disgorge a portion of the profits he obtained as a result of his actions in violation of Section 13(d) and in breach of his fiduciary duty.

We reject the claims raised by both parties, and hold that Judge Carter did not err in finding that Dickinson violated Section 13(d) of the Securities Exchange Act of 1934 and in denying the claims of the class plaintiffs for damages or disgorgement from Dickinson. For the reasons set forth

1. Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d) (1976), provides:

"(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l* (g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information,

as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—"

2. Judge Carter dismissed all other claims against Dickinson, including those for alleged breaches of fiduciary duty and alleged violations of Section 10(b), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(d), 78n(e) (1976). *Wellman v. Dickinson*, 475 F.Supp. 783, 837 (S.D.N.Y. 1979).

3. The order entered on February 19, 1980 provided in pertinent part:

"The prior findings and order of this Court shall remain in effect as to Dickinson and [the SEC's enforcement action] as to Dickinson is otherwise terminated with prejudice."

below, we affirm the district court's judgment and orders in all respects.

## FACTS

Since the facts underlying this appeal are described in detail in the two opinions of the district court, *Wellman v. Dickinson*, 497 F.Supp. 824 (S.D.N.Y.1980); *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y. 1979), we shall only summarize them briefly.

As Judge Carter observed: "The background and governing facts in this complex drama embrace personality conflicts, animosity, distrust, and corporate politics, as well as a display of ingenuity and sophistication by brokers, investment bankers and corporate counsel". *Wellman v. Dickinson, supra*, 475 F.Supp. at 797–98.

One of the principal personalities was Fairleigh S. Dickinson, Jr., the son of a founder of Becton and a major stockholder of the company. He individually held 802,-138 shares of Becton stock (4.2% of the outstanding shares). In addition, Dickinson held 140,794 shares (.64%) as a co-trustee and at least 198,922 shares (1%) as a member of the Dickinson family.

Dickinson personally managed Becton for over twenty-five years. In 1974, Dickinson relinquished his management responsibilities and became Chairman of the Board. In late 1976, however, differences between the new management and Dickinson emerged. On April 20, 1977, after a bitter internal power struggle over the course of several months, the new management team prevailed, and the board of directors voted to remove Dickinson as its chairman.[4]

The day following his removal as chairman, Dickinson met with representatives of Salomon Brothers ("Salomon"),[5] a New York limited partnership engaged in the investment banking and brokerage business, to obtain advice on how to regain control of Becton. In attendance were Jerome Lipper, who was Dickinson's attorney, Kenneth Lipper, brother of Jerome Lipper and a partner of Salomon, Richard Rosenthal and John Gutfreund of Salomon, Martin Lipton, who was Salomon's attorney, and two directors of Becton who were sympathetic to Dickinson. These men discussed several possible strategies. Dickinson ultimately agreed to a plan to vote with outside directors as a means of bringing pressure on Becton's management and selling a block of the company's shares, including his own, to a corporation interested in taking over Becton. Dickinson hired Salomon to assist him in locating a corporation that would be interested in purchasing his substantial holdings in Becton and those of his friends as the springboard for a complete or partial takeover of the company. Dickinson's friends included Dr. J. H. Fitzgerald Dunning, a director of Becton, who personally owned 3,200 shares and served as one of two co-trustees for one of three family trusts which held 344,849 shares (1.8%). Each of his two brothers served as a co-trustee for one of the other two trusts, and Dunning's personal lawyer served as the other trustee for all three trusts.

Shortly thereafter, Salomon was also contacted by Dan W. Lufkin who was concerned about his investment in Becton stock in light of Dickinson's removal from the company's chairmanship. Lufkin was a member of a partnership together with Edward L. Scarff which owned 93,000 shares of Becton stock. The partnership and three other individuals, Richard Drake, Charles Willock, and Robert Smith, were the principals of a kidney dialysis company acquired by Becton in 1977. As a result of that transaction, the partnership received 93,000 shares of Becton stock, Willock received 46,248 shares, and the two other men each received 140,148 shares (total 2.2%). After the acquisition of the dialysis company, Drake, Willock, and Smith continued to rely heavily on Lufkin's partnership for investment advice.

---

4. In September, 1977, Dickinson was terminated as a Becton employee, and in December, 1977, he was dropped from the list of directors to be elected at the Becton annual meeting in February.

5. Dickinson was a personal friend of William Salomon, a senior partner of Salomon Brothers.

Dickinson subsequently contacted Robert Zeller, chief executive officer of F. Eberstadt & Company, Inc. ("Eberstadt"), a Delaware corporation engaged in investment banking, institutional stock brokerage, and the management of pension funds and advisory accounts. Eberstadt had acted for many years as Becton's investment banker. Zeller had also advised Dickinson on the handling of some of his personal affairs. Moreover, an Eberstadt subsidiary, F. Eberstadt & Company Managers & Distributors Inc. ("Eberstadt M & D"),[6] served as investment advisor to two mutual funds (the "Funds"), the Chemical Fund and the Surveyor Fund, which along with a number of Eberstadt-managed discretionary brokerage accounts held 496,075 shares of Becton stock (2.6%). Dickinson informed Zeller that he was asking Salomon to involve Eberstadt in the effort to encourage a corporation to undertake a complete or partial takeover of Becton. Initially, Dickinson and Salomon and Zeller entered into merely an oral understanding. However, after Becton's counsel threatened to sue if Dickinson continued to seek a buyer for a large percentage of Becton stock, Martin Lipton, Salomon's attorney, advised Salomon to obtain written indemnification from Dickinson. By letter dated October 12, 1977, Dickinson confirmed his engagement of Salomon and agreed to indemnify the firm against all claims arising out of its representation of Dickinson in securing a buyer for his stock.

Beginning in the spring of 1977, Salomon and Eberstadt worked earnestly to interest a major corporation in acquiring a minority interest or in effecting a complete takeover of Becton. During the next eight months, Salomon and Eberstadt arranged meetings with several major corporations, including Avon, American Home Products Corp., and Squibb Corp., in an effort to induce these companies to acquire shares in Becton.

Dickinson himself participated in these activities until late December, when he was hospitalized for approximately one month.

The presentations by Salomon and Eberstadt to the corporations potentially interested in purchasing Becton stock were virtually identical. A representative from one of the two brokerage houses would inform the corporation that Salomon and Eberstadt were representing Dickinson. They would then describe Dickinson's animosity toward Becton's management and his desire to dispose of his stock in the company. They would also disclose that other stockholders shared Dickinson's ill feelings and were interested in selling their shares. In each case, the corporation was advised that Dickinson's stock and a block of stock that the brokerage houses represented were available if the corporation was interested in a takeover of Becton. This block of shares included those beneficially owned by the Eberstadt-managed funds and by Dickinson's friends, Dunning and Lufkin. The representative would then outline a takeover plan, placing special emphasis on the number and availability of the shares controlled by Dickinson, the Funds, Dunning, and Lufkin's partnership. They asserted that Dickinson and his family held approximately 1,200,000 shares and that the remaining three members of the group held approximately 1,300,000 shares. Although a portion of these shares were held in trust, the representative assured the potential purchaser that the approximately 2,500,000 shares (13%) were readily available.[7] Moreover, the corporation was usually told that the group's shares of Becton stock would provide a sufficient base from which to launch a more extensive acquisition program for additional shares and a complete takeover of the company.

---

6. At the time of the relevant events, F. Eberstadt & Co. Managers & Distributors, Inc. was 75% owned by Eberstadt and 25% owned by the estate of Ferdinand Eberstadt. It subsequently became a wholly-owned Eberstadt company.

7. The district court indicated that 2.5 million shares represented approximately 16–17% of the total outstanding shares of Becton common stock. *Wellman v. Dickinson, supra,* 475 F.Supp. at 802. Since the total number of outstanding shares of common stock was 19 million, 2.5 million shares represent approximately 13% of the total shares.

The labors of the two brokerage houses eventually bore fruit when Sun Company, Inc. ("Sun"), a Pennsylvania corporation whose principal business involves oil and gas, entered the picture. On November 28, 1977, Kenneth Lipper of Salomon approached Horace Kephart, a senior vice president of Sun in charge of the company's corporate development and diversification program, and suggested that Sun might want to consider Becton as a possible acquisition. Lipper informed Kephart that 15% of Becton's stock was available and that this initial block included 1,200,000 shares owned by Dickinson, 300–400,000 shares owned by Dunning, 400,000 shares owned by Lufkin, and 500,000 shares owned by the Chemical Fund, one of the Eberstadt-managed mutual funds. Lipper also advised Kephart that Sun would be able to acquire quickly an additional 10–20% of Becton stock. Kephart was aware of the rift between Dickinson and Becton's management and learned of Becton's public announcement in June of its desire to remain independent.

At a meeting of Sun's senior executives held in early December, Kephart mentioned Becton as a possible acquisition opportunity. A study of Becton and the health care industry in general was undertaken to determine the desirability of an investment in the company. After reviewing the results of this in-house study, Sun's senior executives decided that the possibility of acquiring Becton should be explored more fully. Accordingly, a number of meetings were held between Dickinson's and Sun's representatives in late December 1977 and early January 1978 to discuss alternative strategies for acquiring Becton. Kephart was given a list of available holdings, including those of Dickinson, Dunning, and Lufkin. Kephart was already aware that a large percentage of Becton's shares was held by institutions, and he was assured that the

500,000 shares of Becton stock held by the Funds and the Eberstadt-managed discretionary accounts were readily available to Sun. Four possible strategies were considered: (1) to seek shares sequentially, first from individuals, then from institutions; (2) to seek shares simultaneously from these two groups; (3) to tender immediately;[8] and (4) to contact management directly. The consensus was that simultaneous purchases from large individual and institutional shareholders, undertaken with as much secrecy as possible, would be the best strategy. Sun would purchase the block held by Dickinson, Dunning, Lufkin and the Funds, and then would conduct a limited solicitation of Becton's institutional holders to reach its target of acquiring 34% of the outstanding shares.[9] This strategy would enable the acquisition to be carried out quickly and would permit Sun to acquire physical possession of the shares in the shortest possible time.

Presentations made to Sun's board of directors on January 5 indicated that a 15% block of the Becton's shares held by four non-management persons were available and additional shares representing 10–20% of the outstanding stock could be readily acquired. Sun executives understood that the block of shares in question belonged to Dickinson, the Funds, Dunning, and Lufkin. On January 11, recommendations concerning an acquisition strategy were presented to Sun's senior officials.

On January 13, Sun's Executive Committee approved the strategy of limited solicitation of large individual and institutional shareholders and authorized the purchase of approximately 34% of Becton's outstanding shares, provided that the total expenditure not exceed $350 million. The transaction was contingent, however, upon Sun's obtaining at least 25% (subsequently lowered

---

8. In the face of hostile management, a conventional tender offer was not considered attractive and was eliminated immediately. It was felt that this strategy would lead to competitive bidding which would make the acquisition more expensive and would result in time consuming legal maneuvering.

9. At this level of stock ownership, Sun would be able to utilize equity accounting and would have sufficient holdings to have a significant voice in Becton's future direction.

to 20%) of the outstanding shares of Becton stock. Sun further agreed to a $700,000 fee to be divided equally between Eberstadt and Salomon, plus indemnification for all their out-of-pocket expenses, including attorneys' fees, due and payable upon the acquisition of 20% of the shares.

The offer proposed a two tier price structure—a higher price of $45 per share with no recourse and a lower figure of $40 per share with a right to receive the highest price paid to any subsequent solicitee.

To complete the first step in effecting the acquisition, on January 14, 1978, Lipper and Zeller went to Dickinson's hospital room and formally presented Sun's proposal to him. Lipper's brother, Jerome Lipper, was also present. Dickinson was told that the matter must be kept confidential and that Sun was the purchaser. After the price options were outlined, Dickinson indicated that he was ready to accept the $45 price but only on the condition that the proposal would be presented to Dunning as well. After guaranteeing Dunning's discretion, Dickinson called Dunning in Baltimore and informed him that Salomon and Eberstadt had presented him with an attractive proposal for the sale of his Becton stock and that he was conditioning his acceptance on the extension of the same offer to Dunning. Dickinson arranged for Dunning to meet with Zeller and Lipper in Baltimore on the following day. Kenneth Lipper then made the same offer given to Dickinson to Dickinson's daughter, Ann Dickinson Turner, who was visiting her father in the hospital. At the request of Jerome Lipper, Turner subsequently delivered her shares and those sold by her father to Sun in New York.

On January 15, Kenneth Lipper and Zeller met with Dunning in Baltimore and extended to him the same offer that they presented to Dickinson. Dunning responded favorably to the proposal and promised to advise them after he conferred with his two brothers and their co-trustee. Sun later purchased about 110,000 shares from each of the three Dunning trusts, for a total of 329,849 shares (1.7%).

On January 16, Kenneth Lipper and another representative of Salomon, met with Lufkin and made him the same offer extended to both Dickinson and Dunning. Although the identity of the purchaser was not disclosed, he was told that Dickinson favored the transaction and that the purchaser was an appropriate company. Lufkin soon learned, however, that Sun was the purchaser. Lufkin indicated that he preferred the $45 price and was confident that he could commit the 93,000 shares of Becton stock that he and his partner, Edward L. Scarff, received after Becton acquired the partnership's interest in a kidney dialysis company. Moreover, Lufkin stated that while he "could not speak for" Richard Drake, Charles Willock, and Robert Smith, the other three principals of the dialysis company who received Becton stock as a result of the takeover, he expected that they would tender their shares. Lufkin immediately telephoned Scarff, who promptly agreed that the partnership shares should be sold at the $45 price. In addition, Scarff promised to contact Richard Drake, Charles Willock, and Robert Smith, and inform them that they had the opportunity to sell their Becton stock at $45 per share to Sun. On January 17, Scarff collected the shares of the three other individuals, receiving their signatures on purchase agreement contracts and on their voting proxies. Scarff then flew to New York to deliver these shares, those of the partnership, and the executed contracts to Sun.

Eberstadt M & D was also offered the same proposal extended to Dickinson, Dunning, and Lufkin. On January 16, a representative of Eberstadt M & D recommended the $45 price to the director of the Funds and of the Eberstadt-managed discretionary accounts. Both groups of directors accepted this offer.

With the favorable response from Dickinson, Dunning, Lufkin, and the Funds, the time was ripe for Sun to commence the second stage of its plan for acquiring 34% of the outstanding stock of Becton. At 4:00 P.M. on January 16, the Sun solicitation team met in the trading room at Salomon's New York offices and began telephone so-

licitations of additional tenders from institutional investors holding large blocks of Becton stock. The team worked in pairs of one caller and one lawyer, who monitored the caller's side of the conversation. The caller solicited offers to sell Becton stock to an anonymous purchaser from at least 20 individuals representing 30 institutions, offering the same two-tier price structure as was extended to Dickinson, Dunning, Lufkin, and Eberstadt M & D. Each solicitee was told that a non-disclosed purchaser was looking for 20% of Becton's stock; that no transaction would be final unless 20% of the shares were acquired; that the $40 option could be accepted without fear of losing the opportunity to obtain a higher price in the event shares were later bought at a higher figure; and that the purchases necessary to reach the desired 20% goal were rapidly being made and that a hurried response was therefore essential. Each solicitee was asked to respond within one hour or less, although some were allowed to wait until the next day. Sun was identified as the purchaser to a few institutions, but in most cases, the purchaser's specific identity was not revealed.

By 5:35 P.M., Kephart of Sun was advised that verbal commitments reached 20%, and Kephart was given authorization to seal the bargain with the institutions that had agreed to tender their shares. The closing price on the New York Stock Exchange for Becton shares on January 16 was $32⅞ per share. Thus, Sun paid a premium of $12⅛ per share over market price to those stockholders which accepted the $45 option. Before the end of the evening, Sun officials had realized their objective of obtaining at least 34% of Becton's outstanding shares. On January 17 and 18, couriers were dispatched throughout the country to pay for the stock, to obtain signatures or collect prepared purchase agreements, to take physical possession of the stock certificates, and to have solicitees sign powers of attorney to allow Sun to vote their proxies.

10. This statement must also be transmitted to the issuer of the security and to each exchange

On January 17, Salomon representatives contacted officials of the New York Stock Exchange and convinced them to halt trading in Becton stock on the ground that an unidentified client would be filing a statement pursuant to Section 13(d) filing two days later, on January 19. Dickinson and Turner, his daughter, also filed separate Section 13(d) statements on January 19. On January 24, the day after the trading ban on Becton stock was finally lifted, the Dunning trusts filed Schedule 13(d) statements.

Sun's lightning strike triggered litigation starting on January 23, 1978. In his first opinion, Judge Carter ruled that Sun had made a tender offer without the requisite filings in violation of Section 14(d), 15 U.S.C. § 78n(d) (1976). Sun agreed to divest itself of its stake in Becton by issuing debentures of 10–25 years maturity which will be exchanged or redeemed for Sun's Becton shares. This agreement, along with the settlement of various class action claims, was approved by Judge Carter on July 31, 1980, and upheld by this court in an unpublished order, *Wellman v. Dickinson*, 647 F.2d 163 (2d Cir. 1981). Sun's liability under Section 14(d) is not at issue in this appeal.

## DISCUSSION

Section 13(d) of the Securities Exchange Act of 1934 requires a group that has acquired, directly or indirectly, beneficial ownership of more than 5% of a class of a registered equity security, to file a statement with the SEC,[10] disclosing, *inter alia*, the identity of its members and the purpose of its acquisition. The central question on appeal is whether the district court erred in finding that Dickinson joined a group holding beneficial ownership of approximately 13% of the outstanding shares of Becton, and in finding that the members of this group agreed to dispose of the Becton stock under their control but failed to disclose

where the security is traded.
.

this fact pursuant to Section 13(d). A group, under Section 13(d)(3), 15 U.S.C. § 78m(d)(3) (1976), is defined as an aggregation of persons or entities who "act ... for the purpose of acquiring, holding or disposing of securities...." The statute contains no requirement, however, that the members be committed to acquisition, holding, or disposition on any specific set of terms. Instead, the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective. *Bath Industries, Inc. v. Blot,* 427 F.2d 97, 111 (7th Cir. 1970). *See also Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207, 217 (2d Cir. 1973); *Texasgulf Inc., v. Canada Development Corp.,* 366 F.Supp. 374, 403 (S.D.Tex.1973). Of course, the concerted action of the group's members need not be expressly memorialized in writing. *Securities and Exchange Commission v. Savoy Indus., Inc.,* 587 F.2d 1149, 1163 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).

Dickinson contends that plaintiffs have not demonstrated that he entered into a formal or informal agreement with any other person to dispose of his Becton stock, or that the purported members of the Section 13(d) group had beneficial ownership of sufficient Becton stock to form a Section 13(d) group with him.

■ In evaluating Dickinson's contentions, we must sift through the record to determine whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between Dickinson and others holding beneficial ownership of more than 5% of Becton stock for the purpose of disposing of the shares under their control. *See id.* The evidence in this case supports the district court's determination that as part of an effort to effectuate a shift in the corporate control of Becton, Dickinson and others holding beneficial ownership of approximately 13% of the company's outstanding stock, reached an understanding to act in concert in disposing of their shares, but failed to disclose this fact as required by Section 13(d).

Ample evidence supports the district court's finding that Dickinson, Eberstadt, Eberstadt M & D, Lufkin, and Dunning "were all part of a group formed to dispose of their shares to aid a third party acquisition of a controlling interest in [Becton]." *Wellman v. Dickinson, supra,* 475 F.Supp. at 830. In reaching its conclusion that an express or implied understanding existed between the group members, the district court relied to a great extent on the representations made by Dickinson and his representatives from Salomon and Eberstadt to potential purchasers concerning the availability of the shares controlled by Dickinson, Dunning, Lufkin, Eberstadt, and Eberstadt M & D.

One vivid example of testimony concerning the assurances made by Dickinson's representatives to potential purchasers is that of William LaPorte, chairman of the board of directors of American Home Products Corporation, one of the companies approached with the Becton takeover proposal. LaPorte testified at trial that Kenneth Lipper of Salomon called to inform him that Dickinson was seeking a company interested in merging with Becton and that 16–17% of the outstanding shares were readily available for sale. Specifically, Lipper indicated, according to LaPorte, that Eberstadt controlled 500,000 shares of Becton and that the shares controlled by Dickinson and Dunning were available and would "go with [the] deal".

John Whitehead, an investment banker for Monsanto Company, another corporation offered the Becton takeover proposal, also testified that Dickinson and his representatives provided assurances concerning the availability of outstanding shares of Becton. Whitehead testified at trial that he was asked "whether Monsanto was interested in buying around 3,000,000 shares [of Becton]" and that the 3,000,000 figure was composed in part of 1,200,000 shares controlled by Dickinson and his family and 1,300,000 shares controlled by Dickinson's friends and associates. Moreover, Whitehead testified that Dunning was named as a

principal owner of the latter group of shares.

Dickinson contends that the representations made by him and his representatives to potential purchasers are not probative of an understanding among the group members because the statements were simply "predictions" as to which Becton shareholders would sell. We reject Dickinson's claim and conclude that, in light of all the facts, the district court could reasonably infer from the evidence that assurances, not mere predictions, were made by the group. *See Securities and Exchange Commission v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1086 (2d Cir. 1977).

Additional direct and circumstantial evidence supports the district court's finding of an agreement between Dickinson, Eberstadt, Eberstadt M & D, Dunning, and Lufkin. The record clearly demonstrates that Dickinson aggregated his family's holdings of 1,200,000–1,300,000 shares of Becton stock and contacted Eberstadt and Salomon for the purpose of finding a corporation acceptable to him that would be interested in buying his substantial Becton holdings. Dickinson solicited Eberstadt to assist in his search for a buyer, aware that the Eberstadt-controlled discretionary accounts held 52,175 of Becton stock (.27%) and that the Funds managed by Eberstadt M & D held 443,200 shares (2.33%).[11]

It is conclusively established that Eberstadt agreed to join Dickinson's effort to interest a corporate purchaser in a takeover or partial takeover of Becton. Executives of Eberstadt were apprised that the brokerage house's fee of $350,000 was contingent on its successful delivery of 20% of the Becton stock to Sun. In an effort to reach this goal, representations concerning the number of group shares attributable to Eberstadt and Eberstadt M & D repeatedly included the discretionary account shares. Moreover, actions taken in connection with Sun negotiations indicate that prior to the receipt of Sun's offer, a determination had already been made to sell the shares held by the discretionary accounts as part of the total shares of the group.

With respect to Eberstadt M & D, substantial evidence supports the district court's finding that it also committed itself to the endeavor of effectuating a shift in the corporate control of Becton. Robert Zeller served as both chief executive officer of Eberstadt and vice-chairman of Eberstadt M & D. Moreover, Eberstadt owned 75% of Eberstadt M & D. Dickinson contends that this finding is erroneous because the court refused to credit the testimony of executives of Sun who stated that Zeller of Eberstadt had disclaimed authority to direct the disposition of shares held by the Funds and that the executives had believed these disclaimers. The court properly discredited this testimony in light of the fact that the notes of these executives taken during their meetings with Dickinson's representatives reflect the executives' understanding that the Funds' shares managed by Eberstadt M & D were available for purchase. Moreover, the individuals who met with Zeller and Lipper, despite Zeller's silence or disclaimer, departed from the meeting convinced that the shares held by the Funds were available with those of Dickinson, Dunning, and Lufkin. "Indeed, Lipper would tell the prospective acquisition clients that Chemical Fund was the bellwether of the institutions holding large blocks of [Becton] stock and that it would sell for the right price, implying that the others would follow suit. Zeller would agree to this statement." *Wellman v. Dickinson, supra*, 475 F.Supp. at 828.

The evidence also supports the inference drawn by the district court that from the beginning, Dunning was a member of the undisclosed group formed to dispose of its shares of Becton. Dickinson kept Dunning abreast of any progress made in the search for a corporation interested in taking over Becton. Moreover, Dunning's name was mentioned as one of the prospective sellers

---

11. The Chemical Fund owned 413,200 shares (2.17%) and the Surveyor Fund owned 30,000 shares (.16%).

of Becton stock to nearly every company solicited by Dickinson's representatives. In addition, when Lipper and Zeller formally presented Sun's offer to Dickinson in his hospital room on January 14, Dickinson said that he would be interested only if the same offer were extended to Dunning. Dickinson contacted Dunning from his hospital room and arranged for Zeller and Lipper to meet with Dunning on the following day.

Finally, the evidence as to Lufkin's participation with Dickinson supports the conclusion that Lufkin was a full participant in the search for a purchaser to take over Becton. On November 10, 1977, Lufkin met with Dickinson, Kenneth Lipper of Salomon, and Jerome Lipper. Lufkin, according to Dickinson, informed them that "he represented a stock holding in [Becton] that grew out of the acquisition by [Becton] of a company on the West Coast", and that he was concerned over the recent internal difficulties at Becton. Lufkin stated that he was "very much in [Dickinson's] corner". Thereafter, Dickinson's representatives always included the approximately 400,000 shares held by the Lufkin partnership and Drake, Willock, and Smith among those who could be counted on as willing sellers. In addition, like Dickinson, his daughter, Dunning, and Eberstadt, the Lufkin partnership and the three other individuals received their offers prior to the extension of formal offers to other solicitees, and Lufkin appears to have been told the identity of the purchaser.

Dickinson, Dunning, Eberstadt, Eberstadt M & D, and Lufkin were linked by a desire to profit from a shift in the corporate control of Becton. The evidence clearly supports the district court's finding that in an effort to achieve their common objective, Dickinson, Eberstadt, Dunning, Eberstadt M & D and Lufkin formed a group to

dispose of the Becton shares under their control.

Dickinson also contends that the district court erred in finding that Eberstadt, Eberstadt M & D, Dunning and Lufkin held beneficial ownership of sufficient Becton stock to form a Section 13(d) group with him because they possessed "the *power to commit* [Becton] shares to the group purpose of effectuating a shift in corporate control". *Wellman v. Dickinson, supra,* 475 F.Supp. at 829 (emphasis supplied). Dickinson contends that control over present voting power should be the sole determinant of beneficial ownership and that the power to dispose of stock is not a relevant consideration.

■ We reject Dickinson's argument. Although voting control is alone sufficient to support a finding of beneficial ownership, it need not be the only indicium. *See* Rule 13d–3, 17 C.F.R. 240.13d–3 (1981).[12] A rule that beneficial ownership can be established only by proof of voting control would exclude from the coverage of Section 13(d) a range of conduct that Congress clearly intended should be covered. Section 13(d) was designed to alert investors in securities markets to potential changes in corporate control and to provide them with an opportunity to evaluate the effect of these potential changes. *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). The power to dispose of a block of securities represents a means for effecting changes in corporate control in addition to the possession of voting control. Moreover, Congress intended beneficial ownership to mean more than voting control when it specifically included within the definition of "person[s]" subject to Section 13(d), a "group" acting in concert for the "purpose

---

12. Rule 13d–3, 17 C.F.R. 240.13d–3 (1981), includes within the term beneficial owner any person "who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such

securities." The SEC adopted Rule 13d–3 in February, 1977 but postponed its effective date until April 30, 1978, subsequent to the events involved in this case. Although Rule 13d–3 is not controlling, it serves as further evidence that the Commission had not intended beneficial ownership to be defined solely as present voting power.

of ... disposing of securities of an issuer". 15 U.S.C. § 78m(d)(3) (1976). In addition, the narrow construction of the term "beneficial ownership" requested by Dickinson conflicts with the legislative history of Section 13(d)(3). Both the Senate and House Reports state:

> "This provision would prevent a group of persons who seek to pool their voting *or other interests* in the securities of an issuer from evading the provisions of the statute because no one individual owns more than ... [5] percent of a class of securities at the time they agreed to act in concert .... This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement." S.Rep.No. 550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep.No. 1711, 90th Cong.; 2d Sess. 8–9 (1968), *reprinted in* [1968] U.S. Code Cong. & Admin.News 2811, 2818 (emphasis supplied).

The evidence clearly supports the district court's findings that the members of the group possessed the power to commit sufficient shares of Becton stock to satisfy the 5% holding requirement of Section 13(d).

With respect to the discretionary accounts managed by Eberstadt M & D, the facts support the conclusion that Eberstadt controlled the disposition of the Becton shares held in these accounts. Although Zeller, chief executive officer of Eberstadt and vice chairman of Eberstadt M & D, did not personally handle the discretionary accounts, his subordinate, Schiefferdecker, managed these accounts. Schiefferdecker was informed of the nature of Zeller's activities on behalf of Dickinson and the fact that Eberstadt's fee for the Sun transaction was contingent on its successful delivery of 20% of Becton's stock to Sun. Moreover, at trial counsel for Dickinson never objected to the propriety of counting these shares toward the 5% holding requirement of Section 13(d).

Similarly, Eberstadt was always in a position to direct the disposition of the 443,200 shares of Becton stock held by the Funds. As the district court stated, "It would be blinking reality to find that Zeller, as chief executive of Eberstadt of which [Eberstadt] M & D was a subsidiary, was unable to make a binding commitment of [the Funds'] shares as a part of the Dickinson, Lipper, Zeller package...." *Wellman v. Dickinson, supra,* 475 F.Supp. at 830. The testimony of John Martin, an unaffiliated director of the Chemical Fund demonstrates that the directors of the Funds followed Eberstadt M & D's recommendations as a matter of course. Martin stated, "I relied heavily on the M & D organization. They are professionals. They have the highest integrity. I have never had reason to doubt their judgment. They do a thorough job of analysis and research. They do not enter into recommendations lightly. Under the circumstances, I have the highest regard for Mr. Nilsen [vice president of Eberstadt and Eberstadt M & D, vice president for investments of the Chemical Fund, and an inside director of the Surveyor Fund] and his judgment, and I rely heavily on his considered judgment, analysis and assurance on which to base my decision, which was really a concurrence of his judgment". *Id.* at 814.

Moreover, the procedures followed in the Sun transaction support the inference that Eberstadt M & D and thus, in turn, Eberstadt, controlled the sales decisions of the Funds. Although all the outside directors of the Funds were polled, Zeller had instructed his subordinates at Eberstadt not to disclose the identity of either the purchaser or the portfolio security offered for sale when polling the directors. These orders were followed. In addition, Eberstadt M & D failed to disclose that a director of Eberstadt had been working with Dickinson to sell his stock as part of a takeover of Becton. Accordingly, we are convinced that the directors routinely followed Eberstadt M & D's recommendation in directing the disposition of the Becton stock, which

permitted Eberstadt M & D to control the shares held by the Funds from the outset.[13]

The record also supports the findings of the district court that Lufkin had the power to commit the 93,000 shares that he held with his partner, Scarff, and the 326,545 shares held by Drake, Willock, and Smith, the three Becton shareholders who relied heavily on Lufkin's partnership for investment advice.[14] Lufkin testified that when he was formally presented with Sun's offer, he felt confident he would be able to commit the Becton shares held by the partnership and that the three other shareholders would tender their Becton stock as well. Lufkin contacted Scarff, indicating that he was in favor of accepting Sun's proposal. Scarff promptly relayed the offer to the three other shareholders, who immediately accepted.

Finally, the inference drawn by the district court that Dunning had effective control over the disposition of the 344,849 shares of Becton stock held by the three Dunning trusts is properly supported by the record. Although Dunning served as one of the two co-trustees for one of the three trusts, each of his two brothers served as a co-trustee for one of the other two trusts. Dunning's personal lawyer served as the other trustee for all three trusts. Moreover, numerous references in the record to those shares as "Dunning's shares" reveal that even the persons most familiar with the facts believed that Dunning had the authority to dispose of the trusts' shares.

The final issue which we consider is the claim raised by class plaintiffs that Dickinson should be required to disgorge the over-the-market premium he received from the sale of his stock to Sun.[15] Class plaintiffs argue that Dickinson violated his fiduciary obligation to Becton shareholders by his failure to advise the company's management that he was searching for a corporation to purchase his Becton holdings, and by his acceptance of a premium for his shares from Sun without offering other shareholders an opportunity to participate. Accordingly, the class plaintiffs continue, Dickinson should not be permitted to retain any profits realized from the transaction. Similarly, class plaintiffs contend that they were deprived of the opportunity to share in the premium which Dickinson obtained as a result of his conduct in violation of Section 13(d), and that this provides an independent basis for ordering the remedy of disgorgement. We conclude that the district court properly rejected both of class plaintiffs' grounds for damages.

■ Although Dickinson violated Section 13(d), there is no evidence that Dickinson had breached any statutory or common law obligation he owed Becton's stockholders. At the time he sold his stock to Sun, Dickinson was a director of Becton. This position, however, placed him under no fiduciary duty to reveal to the company's management his intention to use his Becton holdings to effectuate a third-party takeover of the company, *see Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 889 (3d Cir. 1975), or to refrain from promoting a takeover by a third-party. Dickinson also had no fiduciary obligation to other Becton stockholders to refuse the premium offered by Sun or to advise them that he was receiving a premium. Accordingly, Dickinson did not breach any fiduciary obligation owed to the class plaintiffs. *See Haberman v. Murchison*,

---

**13.** Although, as we have indicated in footnote 12, Rule 13d–3, 17 C.F.R. 240.13d–3 (1981), became effective subsequent to the relevant events involved in this case, we find it incisive that this Rule includes within the term beneficial owner any person "who ... has or shares ... [i]nvestment power which includes the power to dispose, or to direct the disposition of such securities."

**14.** Lufkin's control of Drake's, Willock's, and Smith's shares does not, however, make them members of the Section 13(d) group.

**15.** Class plaintiffs are stockholders who, as of the close of business on January 16, 1978, owned shares of Becton common stock not sold to Sun, and debenture holders who owned 4⅛ % convertible debentures due in 1988. The class consists of approximately 13,000 Becton shareholders who hold 12,706,845 shares and 889 debenture holders who, if their bonds were converted to stock, would hold 225,840 shares.

331 F.Supp. 180 (S.D.N.Y.1971), *aff'd,* 468 F.2d 1305 (2d Cir. 1972).

With respect to class plaintiffs' claim that Dickinson should be required to disgorge the over-the-market premium he received from the Sun purchases because of his failure to file a Section 13(d) statement, we find that plaintiffs have not demonstrated that their alleged injury was directly caused by the Section 13(d) violation or that there was any injury in fact. To recover damages for violation of the Securities Exchange Act, "the loss complained of must proceed *directly* and proximately from the violation claimed and not be attributable to some supervening cause". *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 719 (2d Cir.) (emphasis in original), *cert. denied sub nom., Wood Walker & Co. v. Marbury Management, Inc.,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). Although Dickinson profited from the sale of his Becton shares, his profit was not derived from his failure to file a Section 13(d) statement. Moreover, Dickinson's failure to file such a statement did not cause Sun to purchase his shares. Instead, Sun was interested in purchasing Dickinson's shares for the reason that such a transaction enabled it to acquire a large block of Becton stock expeditiously by dealing with a limited number of individuals and institutions. Similarly, Dickinson's failure to file a Section 13(d) statement did not prevent class plaintiffs from being afforded the opportunity to share in the premium offered by Sun. Since class plaintiffs have not demonstrated that their alleged injury was directly caused by the Section 13(d) violation, the district court properly denied their claims for damages against Dickinson.

Affirmed.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

When reputable and honest businessmen, advised by able and ethical lawyers, are held to have violated a federal statute, the likelihood is that there is something faulty in the statute, the manner in which it is administered, or both. In this case, I believe the fault lies with both. Under the Williams Act, Congress and the SEC have attempted to regulate both purchases and sales of stock with the same set of rules and with an inadequate definition of terms. The result has been less than admirable.

Section 13(d)(1) of the Williams Act, 15 U.S.C. § 78(m)(d)(1), provides that a person who acquires directly or indirectly the beneficial ownership of securities in a class, and thus becomes directly or indirectly the beneficial owner of more than 5% of such class, must file a Schedule 13D statement within ten days of the acquisition. It does not define the term "beneficial owner". Section 13(d)(3) provides that, when two or more persons act as a group for the purpose of "acquiring, holding, or disposing" of such securities, the group shall be deemed to be a "person". The group, says Congress, is deemed to have become the beneficial owner of the securities at the time they agree to act in concert. S.Rep.No. 550, 90th Cong., 1st Sess. (1967); H.R.Rep.No. 1711, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 2811, 2818.

The Commission has codified this expressed congressional intent at 17 C.F.R. § 240.13d–5(b)(1):

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and 13(g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

The Commission's definition of beneficial ownership, which postdates the events at issue herein, incorporates "the power to dispose, or to direct the disposition of," a security. 17 C.F.R. § 240.13d–3(a)(2). However, neither Congress nor the Commission has enlightened us as to how, in the absence of controlling contractual provisions, this incident of beneficial ownership is "deemed" to be exercisable by a group. The record in the instant case does not disclose whether the alleged group was to

act by majority vote, unanimous vote, or in some other manner. If there was an agreement for the formation of the group, such as we have held to be necessary, *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973), we are left completely in the dark as to its pertinent provisions.

My own reading of the record does not satisfy me that Dickinson, Eberstadt, Dunning, and Lufkin had the powers of disposition over stock owned by others which the district court found to exist. For example, the district court's finding that Eberstadt had the power to make a "binding commitment" to sell the Fund shares is, in my opinion, clearly erroneous. That finding treats the Fund directors as automatons, which they were not, and disregards Eberstadt's specific disavowal of the power to assure a sale. In short, if Eberstadt had been sued because it found itself unable to carry out its "binding commitment", I would have been delighted to be the lawyer handling its defense.

I am also troubled by the absence of evidence concerning:

1. The alleged power of Dickinson and Dunning to control the disposition of stock held in trust where there were co-trustees whose assent was required, *see* 90 C.J.S. *Trusts* § 293, at 449;

2. Dickinson's alleged control over the disposition of stock owned by other members of his family, *see Texasgulf, Inc. v. Canada Development Corp.*, 366 F.Supp. 374, 403 (S.D.Tex.1973);

3. Dunning's alleged power to dispose of stock held in two trusts of which he was not even a trustee;

4. Lufkin's alleged control over the investment decisions of a partnership's managing partner and the sale of stock owned by three shareholders whom Lufkin had never even met.

Despite this flimsy showing of individual power and control, the district court concluded that all the group members became beneficial owners of the stock involved.

According to the district court, a group was formed, as an entity separate and distinct from its members, many months be-fore the sale of Becton stock to The Sun Co. Within ten days after its formation, the group or its individual members had to file 13D Schedules. 17 C.F.R. §§ 240.13d–1(a), 240.13d–1(f). These Schedules had to be truthful. *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971), *cert. denied*, 406 U.S. 1910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Both overstatement and understatement had to be avoided. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969). Lack of candor might have resulted in civil or criminal liability on the part of group members. 17 C.F.R. § 240.13d–101; *see United States v. Newman*, 664 F.2d 12, 16 (2d Cir. 1981). More significantly, a misstep in the preparation of a Schedule might have opened the door to the favorite delaying tactic of entrenched management, an application for a temporary injunction. *See, e.g., Electronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 947; *Transcon Lines v. A. G. Becker, Inc.*, 470 F.Supp. 356 (S.D.N.Y.1979); *Nicholson File Co. v. H. K. Porter Co.*, 341 F.Supp. 508, 520 (D.R.I. 1972).

The filing requirement was designed to identify the group "obtaining the benefits of ownership ... by reason of any contract, understanding, relationship, agreement or other arrangement." S.Rep.No. 550, *supra*, at 8. Unlike my colleagues, I am at a loss to know how, in April 1977, the group members could have disclosed the group's method of acquiring ownership (17 C.F.R. § 240.-13d–101, Item 3) so that the disclosure would not have been simply an invitation to litigation. I wonder, for example, how the shareholders of Chemical Fund would have reacted to a pronouncement by Mr. Lufkin that, as a group member, he had become one of the beneficial owners of the Fund's 413,200 shares of Becton stock. *Texasgulf, Inc. v. Canada Development Corp., supra,* 366 F.Supp. at 403. I wonder what would have happened had Dr. Dunning stated that, although neither he nor Mr. Lufkin was acquainted with Robert Smith, Dr. Dunning nonetheless had become a beneficial owner of Mr. Smith's Becton stock. I

wonder if Becton management would have sat idle in the face of a group claim that it was the beneficial owner of stock held in trust by trustees having no association whatever with the group. I think management's reaction would have been one of amazement and would have prompted it to head happily for the nearest court of equity.

The Williams Act was not designed to tip the balance of regulation in favor of management. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58–59, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975). Neither was it designed to provide the SEC with an amorphous regulatory power, the boundaries of which preclude definition by the most skilled of attorneys. The SEC's bland statement in its brief that, even though Eberstadt represented the Fund as well as Mr. Dickinson, there was no "need" to hold the Fund liable, is a prime example of such unfathomable regulation.

With all due respect to my learned colleagues, I cannot join them in affirming a decision that unjustifiably has besmirched an honorable name. I would reverse the district court's holding that appellant Dickinson violated section 13(d) of the Securities Exchange Act. I agree with my colleagues that the balance of the district court's judgment should be affirmed.